2002 SD 122

**CHEM–AGE INDUSTRIES, INC. a South Dakota Corporation; Roger O. Pederson, and Garry Shepard, Plaintiffs and Appellants,**

v.

**Alan F. GLOVER, Defendant and Appellee,**

and

**Byron Dahl, Lynn Dahl, and Doug MacNiel, Defendants.**

**No. 22180.**

Supreme Court of South Dakota.

Argued May 30, 2002.

Decided Oct. 02, 2002.

Lee Schoenbeck, Watertown, SD, for plaintiffs and appellants.

Thomas J. Welk of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, SD, for defendant and appellee.

KONENKAMP, Justice.

[¶ 1.] We are confronted with the question whether a lawyer who incorporates a business on behalf of an individual client owes any duty of care to the corporation thus created and to its director-investors who have no contractual relationship with the lawyer. While obtaining substantial funds and credit from two investors, the client had his attorney incorporate a business, naming the two investors as incorporators and directors. Then the client misappropriated the investors' funds and gave some money and property to the lawyer. The investors and the corporation sued the lawyer, his client, and others to recover all the funds and property, alleging fraud, conversion, malpractice, and breach of fiduciary duty. The circuit court granted summary judgment to the lawyer on all issues, ruling, among other things, that no privity of contract existed between anyone other than the lawyer and his individual client. We conclude that there are material questions of fact on whether the lawyer (1) represented the corporation he created and did so negligently, (2) improperly obtained some of the money and property misappropriated by his client, and (3) knowingly assisted his client in breaching a fiduciary duty to the director-investors and the corporation. We affirm in part, reverse in part, and remand for trial.

## A.

### Background

[¶ 2.] In the past twenty years, attorney Alan F. Glover of Brookings, South Dakota, has represented Byron Dahl, a Watertown entrepreneur, in various transactions and lawsuits around the country. In March 1997, Dahl interested two Watertown businesspersons, Roger O. Pederson and Garry Shepard, in investing in a start-up firm, under the name Chem–Age Industries. Dahl would contribute equipment and expertise; Pederson, and, to a lesser extent, Shepard, would contribute capital. According to attorney Glover's deposition, Dahl had told him "that [Dahl] had basically started up a business in Watertown with the assistance of some people who had chosen to invest their money with him in this business." That is, Chem–Age as a brand new business did not preexist the agreement made by Dahl, Pederson, and Shepard.

[¶ 3.] Sometime during their business engagement (the exact timing is disputed), Pederson obtained a report from a private investigator warning him that Dahl was a "crook." According to Pederson, the report indicated that Dahl

> had done this all over the country. He had done it on the east coast, he done it in Las Vegas. Guy lost his home in Las Vegas. The guy out east lost 300,000.

Pederson executed two "Stock Agreements" and a "Subscription Agreement and Letter of Investment," and despite this report continued to invest thousands of dollars in Dahl's enterprise. According to the terms of the stock agreements as prepared by Dahl, Pederson was to receive 48 shares of common stock in exchange for his investments. Pederson had originally given Dahl $25,000, but both Pederson and Shepard wanted the business to be incorporated before they invested more money. They pressed Dahl to get an attorney involved to set up the corporation. At some point between March and October 1997, Pederson, Shepard, and Dahl decided that Chem–Age Industries would be incorporated under the name "Chem–Age Industries, Inc." Pederson and Shepard agreed to serve as incorporators and directors of the corporation; Dahl agreed to serve as chief executive officer. With this understanding, Dahl engaged Glover to draw up articles of incorporation.

[¶ 4.] Glover prepared the articles and faxed them, either to Dahl alone or to both Pederson and Shepard: the parties disagree on this point. In either case, Dahl secured the signatures of Pederson and Shepard. The articles were dated October 30, 1997. When Dahl delivered the signed articles to him, Glover notarized Pederson's and Shepard's signatures, despite the fact that they had not signed the document in his presence.[1] On the same day, Glover signed a Consent of Registered Agent, agreeing to act as registered agent for "Chem–Age Industries, Inc." Soon thereafter, at Dahl's request, Glover filed the articles with the South Dakota Secretary of State. On November 6, 1997, the Secretary of State issued a Certificate of Incorporation. Glover then sent a letter to the company, attaching an application to obtain a federal tax identification number for the corporation.

[¶ 5.] On November 7, 1997, the day after Chem–Age Industries, Inc., was issued its Certificate of Incorporation, Sam's Club approved a "Business Membership–Credit Application" for "Chem–Age Industries" as a corporation. Pederson, in his capacity as President of Chem–Age, had completed and signed the document on the previous day, listing Dahl as "Billing Representative." By that date, Chem–Age had obtained a "Resale–Tax ID number." Soon thereafter, Pederson had acquired for the company a Bank One credit card, an American Express Optima card, and a charge account at Office Max. Pederson also obtained loans from Norwest Bank to provide operating capital for Chem–Age Industries, Inc. These amounted to some $140,000. It was the understanding of the Bank's representatives that the money was to be used by the corporation. With the number of judgments and liens against Dahl, the bankers would not have loaned him the money.

[¶ 6.] In March 1998, Glover received a desk as a "gift" from Dahl. It was charged on the Chem–Age corporate credit card for $1,113. In August 1998, Sioux Valley Cooperative commenced a lawsuit against Chem–Age, Inc.; Glover was engaged as the attorney for the defendant in that case, serving and filing an answer and counterclaim on behalf of Chem–Age, Inc.

[¶ 7.] By early fall of 1998, Pederson and Shepard became suspicious that they were being swindled: Dahl had accumulated large balances on the company's credit cards for what appeared to be personal items.[2] They engaged attorney John L. Foley of Watertown for legal advice. According to Foley's affidavit, a meeting was held in his office in October 1998. Present were plaintiffs Pederson and Shepard as well as defendants Glover and Dahl. At that meeting, Glover stated that he was representing "the corporation, Chem–Age Industries, Inc.," and that Dahl owned that entity. Foley also reported that Glover and Dahl were negotiating the sale of "the business" to New Age Chemical, Inc., a Wisconsin corporation. In Glover's presence, Dahl told Pederson and Shepard that "they would be paid out of the sale of the business." Pederson and Shepard claim that Glover led them to believe that he would be representing Chem–Age in this sale. Nonetheless, in a document entitled "License Agreement," dated November 11, 1998, the Chem–Age assets were sold to the Wisconsin business, under the name "Byron Dahl d/b/a BMD Associates, a South Dakota sole proprietorship." Glo-

---

1. "It is a Class 2 misdemeanor for any notary public to affix his official signature to documents when the parties have not appeared before him." SDCL 18–1–11.

2. Items charged included "Hamburger Helper"; "Bailey's 750 ml"; and "Food & Beverage" at the "Princess Tower Hotel, Freeport, Bahamas."

ver represented Dahl in that transaction. When later questioned, Glover was not sure of the relationship between Chem–Age Industries, Inc., and BMD Associates.

[¶ 8.] On July 1, 1999, the Secretary of State sent to Glover, as agent of Chem–Age Industries, Inc., a Notice of Pending Administrative Dissolution. Glover was thereby notified that Chem–Age Industries, Inc., was delinquent in filing its annual report as required by SDCL 47–9–1, and that the corporation would be administratively dissolved if the report was not filed before September 13, 1999. After receiving this notice, Glover had separate conversations with Dahl and attorney Foley. Glover decided not to file the annual report, thus allowing an administrative dissolution. (Asserting attorney-client privilege, Glover did not reveal the substance of his conversation with Dahl, though his deposition testimony reveals that he made the decision not to file the report directly after his conversation with Dahl.) Glover did not notify directors Pederson and Shepard of his decision. The Secretary issued a Certificate of Administrative Dissolution on September 19, 1999.

[¶ 9.] A year later, in apparent preparation for suit, new counsel obtained a legal reinstatement of the corporation with the Secretary of State. Thereafter, in October 2000, plaintiffs Chem–Age Industries, Inc., Pederson, and Shepard sued Dahl, Glover, and certain others who were later released by stipulation. Dahl was scheduled to give a deposition on May 3, 2001, but he failed to appear. In fact, Dahl, who initially indicated that he would act *pro se* in this case, has made himself unavailable throughout these proceedings. Glover moved for summary judgment on

all claims against him. Plaintiffs, in turn, moved for summary judgment on two questions: whether Glover owed them a duty, and whether he had breached a fiduciary duty to them. The trial court denied plaintiffs' motion and granted summary judgment to Glover on all plaintiffs' claims.

[¶ 10.] Plaintiffs now appeal on the following issues: (1) "Is there a question of material fact as to whether Glover committed a fraud on any or all of the plaintiffs?" (2) "Is there a question of material fact as to whether Glover converted property of any or all of the plaintiffs?"[3] (3) "Did Glover owe a duty to any or all of the plaintiffs?" (4) "Is there a question of material fact as to whether Glover breached that duty to any or all of the plaintiffs?" (5) "Did Glover owe an additional fiduciary duty to any or all of the plaintiffs?" (6) "Is there a question of material fact as to whether Glover breached that fiduciary duty to any or all of the plaintiffs?" (7) "Is there a question of material fact on whether Glover, because of his conduct toward plaintiffs, should be subject to exemplary damages?" Rather than addressing these questions as framed by counsel, for a more thorough analysis, we explore these issues under the four principal causes of action against Glover: fraud, conversion, legal malpractice, and breach of fiduciary duty.

### B.

### Fraud

■ [¶ 11.] We begin with the question whether Chem–Age Industries, Inc., was a corporation. Glover declares that because no stock was ever issued, "there was never any corporation that could engage in busi-

---

**3.** Our standard of review for summary judgments has been recited in numerous cases and need not be repeated here. *See Kobbeman v. Oleson,* 1998 SD 20, ¶ 4, 574 N.W.2d 633, 635. In accord with this standard, we have related the facts here in a light most favorable to the plaintiffs as the opposing parties.

ness," and thus, as a non-operating entity, Chem–Age Industries, Inc., could not own property and, therefore, could not be aggrieved in the loss of property. On the contrary, "[u]pon issuance of a certificate of incorporation, the corporate existence begins." SDCL 47–2–7. Furthermore, though Glover contends otherwise, it is a disputed fact whether the corporation, Chem–Age Industries, Inc., was empowered to do business because the provisions of SDCL 47–3–40 were not fulfilled. Plaintiffs insist that they did comply with the minimum paid in capital for stock requirement of this statute. Next, we ask, is there a question of material fact on whether Glover committed a fraud on the corporation or the individual plaintiffs?

[¶ 12.] In alleging fraud, plaintiffs cite SDCL 20–10–1, which provides that "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL 20–10–2 lists four types of deceit:

A deceit within the meaning of § 20–10–1 is either:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

Did Glover's acts or representations fall under one or more of the four categories listed in this statute?

[¶ 13.] Plaintiffs argue that Glover's act of drawing up the articles of incorporation on behalf of Pederson and Shepard, as incorporators, constituted deceit because Glover knew that Dahl had been previously sued for shady business practices, had even represented Dahl in those lawsuits, but "suppressed" this information by not telling Pederson and Shepard of Dahl's dishonest history. Glover had represented Dahl in various disputes in South Dakota, Arizona, Florida, and Virginia. It seems that Dahl has had a career of failed business ventures and financial adversity. But lack of success is not proof of dishonesty. Plaintiffs provide no confirmation of any actual dishonesty by Dahl in the past, much less Glover's knowledge of it. Evidently, no dispute ended with any official finding that Dahl committed fraud or deceit.

[¶ 14.] Plaintiffs allege that Glover deceived Pederson and Shepard by leading them to believe that he was their attorney and by drawing up articles of incorporation naming them as incorporators and directors. To establish that Glover committed fraud, plaintiffs must present specific evidence tending to show that Glover knowingly acted directly to defraud them or knowingly acted to facilitate the fraud attributable to Dahl. SDCL 20–10–1 and 2. Fraud requires, among other things, a material misrepresentation, either known to be false when made or asserted without grounds for believing it to be true. *Id.*

[¶ 15.] In *Tucek v. Mueller*, a father of an automobile accident victim defrauded his daughter by forging her name to negotiate a quick settlement with the insurance company, using the insurance money to pay off delinquent bank loans. 511 N.W.2d 832 (S.D.1994). There, we concluded that genuine issues of material fact remained on what role the insurer and its agent and the bank and its employee nota-

ry public had in assisting the father in the fraud, since it was "abundantly clear that [those individuals] either assisted or participated with Mueller in this adjudicated fraud and deceit." *Id.* at 834.

[¶ 16.] In contrast, almost all the facts plaintiffs rely on here are oblique and conjectural. It is true that allegations of fraud and deceit are ordinarily questions of fact to be decided by a jury. *Id.* at 836 (citation omitted). But unsupported assertions do not raise a genuine issue of fact. *Paradigm Hotel Mortg. Fund v. Sioux Falls Hotel Co., Inc.*, 511 N.W.2d 567, 569 (S.D.1994). Moreover, averments of fraud must be stated with particularity. SDCL 15–6–9(b). Plaintiffs attempt to depict Glover not only as directly deceitful but also as Dahl's accomplice, a willing partner in Dahl's dishonesty. They claim that Glover knew Dahl was "involved in a scam," since Dahl has had a history of disputes with investors. Because Glover knew of these problems, they argue, he knew Dahl was cheating them, and thus his legal services constituted fraudulent conduct. Glover was aware of a criminal investigation of Dahl in Arizona occurring sometime in the past, but apparently no criminal charges were lodged against Dahl at that time.[4]

[¶ 17.] Plaintiffs' proof of Glover's knowledge comes in allegations mostly from affidavits. Much of it hardly rises to the level of bare insinuation. One affiant, for example, said that he invested money with Dahl in the early 1980s and later "determined he was pulling a scam." This person demanded his investment money back. He received it. In that instance, Glover represented Dahl. This affiant went on to speculate that Dahl obtained the money to pay him from other deceived investors. He also suggested that Dahl

had false academic credentials. He later read in a Phoenix newspaper that Dahl was "taken to court in Phoenix and he and his two cohorts were ordered to pay back about $2 million."

[¶ 18.] Certainly, this latter allegation—and many of the others—would never be admitted as evidence in trial. Evidence submitted in affidavits as part of a summary judgment proceeding must be legally admissible. SDCL 15–6–56(e) ("affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence...."). Parties cannot rely on recitations of hearsay in affidavit form, without also laying a foundation for an exception to the hearsay rule. *Churchill Bus. Credit, Inc. v. Pac. Mut. Door Co.*, 49 F.3d 1334, 1337 and n.6 (8thCir.1995); *Miller v. Solem*, 728 F.2d 1020, 1026 (8thCir.1984). In sum, those resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A motion under SDCL 15–6–56 (Rule 56) is designed "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Therefore, the focus in summary judgment hearings centers on the existence of admissible and probative evidence to support the challenged claim or defense. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8thCir.1997).

[¶ 19.] Glover's past experience with Dahl in representing him in disputes with investors is not enough to create a

---

**4.** After the events here in question, Glover learned that Dahl had been criminally charged in Florida with another investment-related swindle.

question of material fact on whether Glover acted directly to defraud plaintiffs or on whether he knew or should have known that the incorporation documents he prepared would be used as a vehicle to bilk the investors. Without proof of a lawyer's complicity, a client's wrongful behavior, however egregious, may not be imputed to the lawyer. We conclude that the record is insufficient to show that Glover defrauded plaintiffs either alone or in concert with Dahl. As plaintiffs had the burden of proof in alleging fraud, and as Glover has demonstrated that no genuine issue of material fact exists, the circuit court correctly granted summary judgment on Glover's motion.[5]

## C.

### Conversion

[¶ 20.] Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right. *Ward v. Lange*, 1996 SD 113, ¶ 17, 553 N.W.2d 246. "Intent or purpose to do a wrong is not a necessary element of proof to establish conversion." *Rensch v. Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 271 (S.D.1986).

> The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.

*Id.* at 271 (quoting *Poggi v. Scott*, 167 Cal. 372, 375, 139 P. 815, 816 (1914)).

[¶ 21.] Plaintiffs allege that Glover converted their corporate property, specifically, $1,800 in attorney's fees and $1,113 in office furniture. The attorney's fees apparently were paid either out of the loan money that Pederson secured for Chem–Age from the bank or from a cash advance on the American Express Optima credit card issued to Chem–Age Industries. Dahl obtained the furniture from Interstate Office Products in March 1998 by using the corporate Optima card, but the resulting debt was not paid by Dahl either personally or through Chem–Age. It seemingly remains a debt of the corporation, but Roger Pederson is also personally liable for it. Copies of cashed corporate checks attest to Glover's having received payment for attorney's fees. The record also shows that Glover remains in possession of the furniture because he contends that it was a gift from Dahl.

[¶ 22.] To substantiate his claim that the furniture could not have been other than a gift from Dahl personally, Glover cites SDCL 47–3–40, which provides:

> A corporation except corporations not for profit shall not do or engage in any business or incur any indebtedness, except such as shall be incidental to its organization or to obtaining subscriptions to or payment for its shares, until there has been paid in for the issuance of shares consideration of the value of at least one thousand dollars.

Now, it is undisputed that Chem–Age Industries, Inc., had not issued any shares

---

5. Because we hold that plaintiffs have not established a cause of action for fraud, it does not mean that plaintiffs cannot proceed on their claim for punitive damages. SDCL 21–3–2. Conversion and breach of fiduciary duty may give rise to punitive damages, and plaintiffs may proceed to seek such damages if they succeed in either of those claims. *Grynberg v. Citation Oil & Gas Corp.*, 1997 SD 121, ¶ 18, 573 N.W.2d 493, 500.

before its administrative dissolution in September 1999. By the terms of SDCL 47–3–40, Glover argues that the company was not authorized to engage in any business. Glover then reasons that, because Chem–Age could not conduct business, it could not, as a matter of law, own any property. However, Glover cites no authority for this claim, and failure to cite authority waives the argument that depends on it. *Longwell v. Custom Benefit Programs Midwest, Inc.*, 2001 SD 60, ¶ 30, 627 N.W.2d 396, 401 (citing *Hart v. Miller*, 2000 SD 53, ¶ 45, 609 N.W.2d 138, 149).

▆▆▆ [¶ 23.] Material questions of fact exist on whether Glover converted property belonging to the corporation. Thus, summary judgment for Glover on this issue is reversed, and the matter is remanded for trial.

## D.

### Legal Malpractice

▆▆▆▆ [¶ 24.] To prevail in a legal malpractice claim, a plaintiff must prove: (1) the existence of an attorney-client relationship giving rise to a duty; (2) the attorney, either by an act or a failure to act, breached that duty; (3) the attorney's breach of duty proximately caused injury to the client; and (4) the client sustained actual damage. *Ford v. Moore*, 1996 SD 112, ¶ 7, 552 N.W.2d 850, 852 (citation omitted). Whether an attorney-client relationship existed is ordinarily a question of fact. *Keegan v. First Bank of Sioux Falls*, 519 N.W.2d 607, 611 (S.D.1994) (citation omitted). Here, we will examine the elements for an attorney-client relation-

ship regarding, first, the corporation and, next, the individual plaintiffs.

### 1. Corporation as Client

▆▆▆ [¶ 25.] Dahl hired Glover to organize the business as a corporation. By his own admission, Glover's involvement with Dahl was directly related to that incorporation, notwithstanding Dahl's earlier engagement of Glover on personal matters before and independent of the events at issue here. As we concluded above, the business was incorporated. Glover contends nonetheless that he did not represent the corporation. This is clearly a question of material fact. In the absence of some indication otherwise, Glover can be deemed the attorney for the corporation, even if he was also representing Dahl personally. An attorney may represent both a corporation and individuals in the corporation.[6] *Torres v. Divis*, 144 Ill. App.3d 958, 98 Ill.Dec. 900, 494 N.E.2d 1227, 1231 (1986). Plaintiffs offered evidence, albeit disputed, that Glover not only set up the corporation as a legal entity, but also held himself out as the company's attorney, both in personal conversations with outside parties and in a formal appearance in another court action.

▆▆▆ [¶ 26.] If it is shown that he represented the corporation, then it follows that Glover had a duty to the client corporation. Plaintiffs contend that Glover, along with Dahl, improperly arranged for the sale of corporate assets and that those assets were converted to personal use by Dahl. Consequently, plaintiffs assert that the company suffered losses. In the case of *Willner's Fuel Distribs. v. Noreen*, 882

---

**6.** *See also* South Dakota Rules of Professional Conduct Rule 1.13(e): "A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organiza-

tion's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders."

P.2d 399 (Alaska 1994), the Alaska Supreme Court ruled that summary judgment for an attorney was improper in an action by a creditor of the corporation, where the attorney represented both the dissolved corporation and a director and knew or should have known that the director may have intended to interfere with creditors' claims through improper distribution of assets. *See also Good Old Days Tavern, Inc. v. Zwirn,* 259 A.D.2d 300, 686 N.Y.S.2d 414 (1stDep't 1999), appeal and reargument denied, 261 A.D.2d 288, 691 N.Y.S.2d 759 (1stDep't 1999). Here, plaintiffs have alleged sufficient facts to take this case beyond the reach of summary judgment. We reverse the circuit court's decision to the contrary and remand for trial.

## 2. Individual Constituents as Clients

■■■■ [¶ 27.] South Dakota recognizes that an attorney-client relationship may arise expressly or impliedly from the parties' conduct. *Keegan,* 519 N.W.2d at 611 (citation omitted). Such a relationship is created when: (1) a person seeks advice or assistance from an attorney; (2) the advice or assistance sought pertains to matters within the attorney's professional competence; and (3) the attorney expressly or impliedly agrees to give or indeed gives the advice or assistance. *Id.* Whether an attorney agrees to give or actually gives the desired advice or assistance "may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide [those services] and the attor-

ney, aware of such reliance, does nothing to negate it." *McVaney v. Baird, Holm, McEachen, Pedersen, Hamann & Strasheim,* 237 Neb. 451, 466 N.W.2d 499, 506 (1991).

■■■ [¶ 28.] Here, the individual plaintiffs sought no advice from Glover. Correspondingly, Glover never agreed to advise or assist them. Moreover, Glover never sent them a bill for services rendered. *See TJD Dissolution Corp. v. Savoie Supply Co., Inc.,* 460 N.W.2d 59, 62 (Minn.App. 1990). Beyond a brief introduction to Pederson and Shepard, Glover's only communication was with his long-time client, Dahl. Glover had no personal consultation with Pederson and Shepard in creating the corporation. All their dealings were with Dahl. True, Glover notarized Pederson's and Shepard's signatures, without having them before him. However unlawful that was, it did not create an attorney-client relationship. Furthermore, nothing in the record suggests that the purpose of Glover's arrangement with Dahl was to confer the benefit of legal advice for plaintiffs. We conclude that the record is insufficient to show a contractual arrangement wherein Glover agreed to represent anyone other than Dahl and the corporation. Other courts have held similarly.[7]

■■■ [¶ 29.] Certainly there may be unique circumstances, outside the ordinary corporate arrangement, where shareholders with equal interest in a close corporation who have ongoing contact with corporate counsel may reasonably believe that

7. *Hile v. Firmin, Sprague & Huffman Co., L.P.A. et al.,* 71 Ohio App.3d 838, 595 N.E.2d 1023 (3rd Dist. 1991) (attorney for corporation owed no duty to board of directors individually); *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 742 So.2d 381 (4th Dist. 1999) (attorney who represents corporation not in privity with and therefore owes no separate duty of care to individual sharehold-

er absent special circumstances or an agreement to also represent the shareholder individually); *Goerlich v. Courtney Industries, Inc.* 84 Md.App. 660, 581 A.2d 825 (1991), *cert. denied,* 322 Md. 130, 586 A.2d 13 (1991) (no contractual privity between attorney and plaintiff in his capacity as employee; *see also* Restatement (Second) of Torts § 876(a).

counsel is representing each of them. *Rosman v. Shapiro*, 653 F.Supp. 1441, 1445 (S.D.N.Y.1987); *Bobbitt v. Victorian House, Inc.*, 545 F.Supp. 1124, 1126 (N.D.Ill.1982) (question must be decided on the individual facts of each case). But in the absence of any professional contact between Glover and the individual plaintiffs, those singular circumstances do not exist here. Furthermore, if there had been proof that Glover engaged in some fraud to mislead these investors, we might view their claim differently. *See, for example, Trust Co. of Louisiana v. N.N.P. Inc.*, 104 F.3d 1478 (5thCir.1997) (attorney for promoter of shell corporations falsely represented that he had custody of certificates available as collateral). We sustain the circuit court's grant of summary judgment on this question.

### 3. Nonclient Third Party Beneficiaries

■ [¶ 30.] South Dakota has long subscribed to the strict privity rule in attorney malpractice cases. Thus, to recover for a lawyer's negligence, a plaintiff must first show that an attorney-client relationship existed between the lawyer and the plaintiff. *Ford*, 1996 SD 112 at ¶ 7, 552 N.W.2d at 852; *McGlone v. Lacey*, 288 F.Supp. 662, 665–66 (D.S.D.1968). In many other jurisdictions, however, although the state of the law governing attorney liability to nonclients remains unsettled, there has been a notable increase "in case law and professional literature on attorney liability to third parties." *See Flaherty v. Weinberg*, 303 Md. 116, 492 A.2d 618, 620 (1985). These authorities recognize a privity rule exception, particularly in contract actions, but its scope sometimes extends to the area of will drafting and estate planning. *See generally* Joan Teshima, Annotation, *Attorney's Liability, to One Other Than Immediate Client, for Negligence in Connection with*

*Legal Duties*, 61 A.L.R.4th 615 (1988). Assuming for the moment that we might recognize this exception, the question then is whether it should be expanded to negligence actions. Obviously, this exception should not expose attorneys to unlimited litigation brought by anyone who might conceivably derive some indirect benefit from the performance of attorneys for their contractual clients. Moreover, this exception should have limited application in adversarial proceedings because the rules of ethics require that lawyers represent their clients zealously within the bounds of the law and that lawyers ordinarily not represent or act for conflicting interests in business transactions. South Dakota Rules of Professional Conduct, ch 16–18.

[¶ 31.] There are several reasons courts are reluctant to relax the rule of privity in attorney malpractice cases. First, the rule preserves an attorney's duty of loyalty to and effective advocacy for the client. *Simon v. Zipperstein*, 32 Ohio St.3d 74, 512 N.E.2d 636, 638 (1987). Second, adding responsibilities to nonclients creates the danger of conflicting duties. John H. Bauman, *A Sense of Duty: Regulation of Lawyer Responsibility to Third Parties by the Tort System*, 37 S Tex L Rev 995, 1006 (1996). Third, once the privity rule is relaxed, the number of persons a lawyer might be accountable to could be limitless. *Nat'l Savings Bank v. Ward*, 100 U.S. [10 Otto] 195, 198, 25 L.Ed. 621, 624 (1879). Fourth, a relaxation of the strict privity rule would imperil attorney-client confidentiality. *Noble v. Bruce*, 349 Md. 730, 709 A.2d 1264, 1278 (1998). *See* SDCL 16–16–18 (oath of attorney); SDCL 16–18–18 (attorney's duty to respect client's confidence); South Dakota Rules of Professional Conduct, *Preamble, A Lawyer's Responsibilities*, ch 16–18, Appx.

[¶ 32.] Those jurisdictions that maintain the strict privity rule do so because

> not only should an attorney know in advance who is being represented and for what purpose, but also the attorney should be able to control the scope of the representation and the risks to be accepted. Imposing liability in favor of nonclients, generally speaking, threatens those interests. In threatening the interests of the attorney, the interests of potential clients may also be compromised; they might not be able to obtain legal services as easily in situations where potential third party liability exists. Before abandoning privity, the courts need a good reason for thinking that the private arrangements are inadequate.

*Bauman*, 37 S. Tex. L. Rev. at 1005–06. Because trust and confidence between attorney and client are essential, the relationship requires greater protection from third-party claims than do nonconfidential relationships.

[¶ 33.] Perhaps cognizant that legal malpractice is one of the last citadels of the privity doctrine, the Restatement (Third) of the Law Governing Lawyers sanctions limited instances where a lawyer owes a duty of care to nonclients. *See* Restatement (Third) of the Law Governing Lawyers § 51 (1998). Of course, the Restatement's pronouncements are not binding on this Court; nevertheless, we have found its reasoning persuasive in many instances.[8] Subsections (2) and (3) of § 51 provide in pertinent part:

> For purposes of liability under § 48, a lawyer owes a duty to use care within the meaning of § 52 in *each* of the following circumstances:

(2) to a nonclient when and to the extent that:

> (a) the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the nonclient to rely on the lawyer's opinion or provision of other legal services, and the nonclient so relies; and
>
> (b) the nonclient is not, under applicable tort law, too remote from the lawyer to be entitled to protection;

(3) to a nonclient when and to the extent that:

> (a) the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the nonclient;
>
> (b) such a duty would not significantly impair the lawyer's performance of obligations to the client; and
>
> (c) the absence of such a duty would make enforcement of those obligations to the client unlikely; ...

As to Subsection (2), unquestionably Glover's client, Dahl, did invite Pederson and Shepard to rely on Glover's services to effect incorporation, and their reliance was, at least arguably, reasonable. However, the routine act of incorporating a business is a function distinct and separate from advising and warning individual constituents of all the consequences and dangers inherent in investing in a corporation. *See Michel v. Gard*, 181 Ill.App.3d 630, 130 Ill.Dec. 164, 536 N.E.2d 1375 (1989). Pederson and Shepard never asked for any advice and never met with Glover regarding the process of incorporation. There is no evidence that Glover acquiesced in any invitation Dahl may have made to these investors to rely on Glover's opinion or to

---

**8.** *See* J. Myron Jacobstein & Roy M. Mersky, Fundamentals of Legal Research 365 (5th ed.1990) (the goal of the American Law Institute in publishing the Restatements was to "produce a clear and precise restatement of the existing common law").

provide some additional legal service other than incorporating the business.

■■■ [¶ 34.] As to Subsection (3), we find no evidence in the record to establish that the primary purpose for Dahl's contacting an attorney to incorporate the business was to benefit plaintiffs. The comment from § 51 further explains this requirement:

A nonclient's claim under Subsection (3) is recognized *only* when doing so will both implement the client's intent and serve to fulfill the lawyer's obligations to the client without impairing performance of those obligations in the circumstances of the representation. A duty to a third person hence exists *only* when the client intends to benefit the third person as one of the primary objectives of the representation.

Restatement (Third) of the Law Governing Lawyers § 51 cmt. f (1998); *see also Lee v. Mitchell*, 152 Or.App. 159, 953 P.2d 414 (1998) (shareholders in close corporation's stock not third-party beneficiaries of corporation's contract with its attorneys; no proof that those who dealt with corporation intended to benefit shareholders as individuals). Under this limited exception, to establish a duty owed by the attorney to the nonclient, the nonclient

must allege and prove that the intent of the client to benefit the nonclient was a direct purpose of the transaction or relationship. In this regard, the test for third party recovery is whether the intent to benefit actually existed, not whether there could have been an intent to benefit the third party.

*Flaherty*, 492 A.2d at 625. Thus, an incidental benefit to a nonclient is not sufficient. *Id.* at 625 n. 6.

■■■ [¶ 35.] The South Dakota Rules of Professional Conduct provide that "in dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing." Rule 1.13(d). *See, e.g., Brennan v. Ruffner*, 640 So.2d 143 (Fla.App.4th Dist. 1994) (corporation attorney could not be liable to minority shareholder for breach of fiduciary duty in drafting of shareholders' agreement, where lawyer told shareholders collectively that he represented only the corporation in drafting of agreement). In our case, it is clear, at least in hindsight, that Dahl's interests were different from those of the corporation and its investors. Strict application of Rule 1.13(d) would have required that Glover explain to the directors (Pederson and Shepard) that he was undertaking to represent Dahl individually. However, apart from creating the corporation, he undertook no responsibility, such as preparing a shareholder agreement, which would call particular attention to the need to advise the others of his allegiance to Dahl only. Thus, even if we were to recognize the third party beneficiary exception, plaintiffs have brought forth insufficient evidence to invoke it here.

### E.

### Breach of Fiduciary Duty

#### 1. Direct Breach of Fiduciary Duty to Nonclients

[¶ 36.] As we determined above, there remains a question of material fact whether an attorney-client relationship existed between Glover and Chem–Age Industries, Inc. If such a relationship did exist, then Glover owed a fiduciary duty to the corporation. *Himrich v. Carpenter*, 1997 SD 116, ¶ 13, 569 N.W.2d 568, 572. If, in turn, Glover had such a fiduciary duty, then there remains a question of material fact whether Glover breached that duty. A

fiduciary duty to the corporation, in that circumstance, would arise from the attorney-client relationship.

■ [¶ 37.] On the other hand, we earlier found that no attorney-client relationship existed between Glover and the two investor-directors, Pederson and Shepard. We now turn to the question whether Glover may have owed a fiduciary duty to them or to the corporation, even in the absence of an attorney-client relationship. The existence and scope of a fiduciary duty are questions of law. *High Plains Genetics Research, Inc. v. JK Mill–Iron Ranch*, 535 N.W.2d 839, 842 (S.D.1995) (citations omitted). Whether a breach of a fiduciary duty occurred, however, is a question of fact. *Id.*

■ [¶ 38.] To ascertain a fiduciary duty, we must find three things: (1) plaintiffs reposed "faith, confidence and trust" in Glover, (2) plaintiffs were in a position of "inequality, dependence, weakness, or lack of knowledge" and, (3) Glover exercised "dominion, control or influence" over plaintiffs' affairs. *Garrett v. BankWest Inc.*, 459 N.W.2d 833, 838 (S.D.1990) (citing *Union State Bank v. Woell*, 434 N.W.2d 712, 721 (N.D.1989)). "Fiduciary relationships juxtapose trust and dependence on one side with dominance and influence on the other." *High Plains Ge-*

*netics Research, Inc.*, 535 N.W.2d at 842. To recover for breach of fiduciary duty, a plaintiff must prove: (1) that the defendant was acting as plaintiff's fiduciary; (2) that the defendant breached a fiduciary duty to plaintiff; (3) that plaintiff incurred damages; and (4) that the defendant's breach of the fiduciary duty was a cause of plaintiff's damages. *Grand State Property, Inc. v. Woods, Fuller, Shultz, & Smith, P.C.*, 1996 SD 139, ¶ 16, 556 N.W.2d 84, 88 (citations omitted).

[¶ 39.] We have always recognized the lawyer-client relationship as highly fiduciary. *Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259 (S.D.1988). In South Dakota, however, we have not extended a cause of action for breach of fiduciary duty to instances involving lawyers and nonclients, but other jurisdictions have opened the door to this claim. In those cases, when attorneys breach a fiduciary duty to nonclients, liability typically arises when a trust or guardianship beneficiary sues the trust or guardianship attorney for failing to prevent the misappropriation and mismanagement of the estate.[9] *See, e.g., Fickett v. Superior Court*, 27 Ariz.App. 793, 558 P.2d 988 (1976); *Pizel v. Zuspann*, 247 Kan. 54, 795 P.2d 42 (1990). But liability also occurs in the corporate sphere. *Collins v. Telcoa Intern. Corp.,*

---

**9.** The Restatement (Third) of the Law Governing Lawyers § 51 defines a lawyer's duties to a nonclient, when the lawyer's client is a fiduciary:

For purposes of liability under § 48, a lawyer owes a duty to use care within the meaning of § 52 in *each* of the following circumstances:

(4) to a nonclient when and to the extent that:

(a) the lawyer's client is a trustee, guardian, executor, or fiduciary acting primarily to perform similar functions for the nonclient;

(b) the lawyer knows that appropriate action by the lawyer is necessary with re-

spect to a matter within the scope of the representation to prevent or rectify the breach of fiduciary duty owed by the client to the nonclient, where (i) the breach is a crime or fraud or (ii) the lawyer has assisted or is assisting the breach;

(c) the nonclient is not reasonably able to protect its rights; and

(d) such a duty would not significantly impair the performance of the lawyer's obligations to the client.

Restatement (Third) of the Law Governing Lawyers § 51(4) (1998).

283 A.D.2d 128, 726 N.Y.S.2d 679 (2nd Dept. 2001) (allegations by minority shareholder that corporation's attorney had duty to act responsibly to protect shareholder's interests adequately stated cause of action for attorney's breach of fiduciary duty); *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler,* 107 Mich.App. 509, 309 N.W.2d 645, 648 (1981) (question of fact existed whether confidential relationship existed between the two shareholders of a closely-held corporation and the corporation's attorney, even if no attorney-client relationship existed between them). *But see Angel, Cohen & Rogovin v. Oberon Inv., N.V.,* 512 So.2d 192 (Fla.1987).

■ **[¶ 40.]** Plaintiffs Pederson and Shepard have submitted no evidence to show how they were in a confidential relationship with Glover, where they depended on him specifically to protect their investment interests, and where Glover exercised dominance and influence over their business affairs. On the contrary, they never consulted with Glover during the time he is alleged to have breached a fiduciary duty to them. Aside from simple avowals that they believed Glover was watching out for their interests, their claim that Glover was entrusted with explicit responsibility for their investments is "factually unsupported." *Celotex,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265. Likewise for the corporation: outside the existence of an attorney-client relationship, we detect no facts justifying a fiduciary duty owed to the company. We conclude that there was no direct fiduciary relationship between Glover and plaintiffs.

### 2. Aiding and Abetting Breach of Fiduciary Duty

**[¶ 41.]** Although he may not have directly breached a fiduciary duty, if Glover assisted Dahl in a breach of Dahl's fiduciary duty, Glover may still be subject to liability. Plaintiffs' complaint alleges that both Dahl and Glover breached their fiduciary duties. The Restatement provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

Restatement (Second) of Torts § 876(b) (1977). *See also* SDCL 15–8–11 (defining joint tortfeasor). Several courts recognize a cause of action for aiding and abetting the breach of fiduciary duty.[10] *See, e.g., Blow v. Shaughnessy,* 88 N.C.App. 484, 364 S.E.2d 444 (N.C.App.1988); *Holmes v. Young,* 885 P.2d 305, 308 (Colo.App.1994) (claim against attorney for aiding and abetting the breach of fiduciary duty in the partnership context). When they participate in their clients' tortious acts, lawyers are not exempt from liability under this theory.

> Legal authorities ... are unanimous in expressing the proposition that one who knowingly aids another in the breach of a fiduciary duty is liable to the one harmed thereby. That principle readily extends to lawyers. None of those authorities even implies that liability for participants in the breach of fiduciary duty is confined to those who *themselves* owe such duty.

*Granewich v. Harding,* 329 Or. 47, 985 P.2d 788, 793–94 (1999) (footnotes omitted).[11] In *Granewich,* the defendant attor-

---

**10.** *See generally* Bryan C. Barksdale, *Redefining Obligations in Close Corporation Fiduciary Representation: Attorney Liability For Aiding and Abetting the Breach of Fiduciary Duty In*

*Squeeze–Outs,* 58 Wash & Lee L Rev 551 (Spring 2001).

**11.** Indeed, the South Dakota Rules of Professional Conduct provide: "Where the client is

neys provided substantial assistance to the controlling shareholders to squeeze out the minority shareholder in breach of the fiduciary duties the majority shareholders owed to the minority shareholder. Unlike the fraud allegations against Glover, which require proof of misrepresentations, liability for aiding and abetting breach of a fiduciary duty requires only the giving of substantial assistance and encouragement. *See* Restatement (Second) of Torts § 876 cmt. b (1979) (one who gives advice or encouragement to a tortfeasor is also a tortfeasor).

[¶ 42.] Dahl, as the operating officer of the corporation, owed a fiduciary duty to the company and to its investors. Like controlling shareholders, officers and directors possessing discretion in the management of a company have a fiduciary duty "to use their ability to control the corporation in a fair, just, and equitable manner...." *Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464, 471 (1969). For summary judgment purposes, the evidence that Dahl breached his fiduciary duties to the corporation and the investor-directors remains wholly uncontradicted. He used corporate funds for personal expenditures; he failed to deliver promised stock issues; he sold corporate assets and kept the proceeds. Now the question is whether his lawyer may be subject to liability for assisting Dahl in his breach of fiduciary duties.

[¶ 43.] Holding attorneys liable for aiding and abetting the breach of a fiduciary duty in rendering professional services poses both a hazard and a quandary for the legal profession. On the one hand, overbroad liability might diminish the quality of legal services, since it would impose "self protective reservations" in the attorney-client relationship. *Goodman v. Kennedy*, 18 Cal.3d 335, 134 Cal.Rptr. 375, 556 P.2d 737, 743 (1976). Attorneys acting in a professional capacity should be free to render advice without fear of personal liability to third persons if the advice later goes awry. *Schott v. Glover*, 109 Ill. App.3d 230, 64 Ill.Dec. 824, 440 N.E.2d 376, 379 (1st Dist. 1982). On the other hand, the privilege of rendering professional services not being absolute, lawyers should not be free to substantially assist their clients in committing tortious acts. To protect lawyers from meritless claims, many courts strictly interpret the common law elements of aiding and abetting the breach of a fiduciary duty. *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186–87 (Minn.1999).

[¶ 44.] The substantial assistance requirement carries with it a condition that the lawyer must actively participate in the breach of a fiduciary duty. *See Spinner v. Nutt*, 417 Mass. 549, 631 N.E.2d 542, 546 (1994) (allegation that trustees acted under legal advice of defendants, without more, is insufficient to give rise to claim that attorney is responsible to third persons for fraudulent acts of clients); *Schatz v. Rosenberg*, 943 F.2d 485, 487 (4thCir.1991) (attorney's liability for aiding and abetting a breach of duty under federal securities law).[12] Merely acting as a scrivener for a client is insuffi-

a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary." SDCL 16–18, comment to Rule 1.2.

**12.** The United States Supreme Court has since held that federal law does not permit a private cause of action for aiding and abetting a securities violation. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver,* *N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The analysis used by the federal courts regarding Restatement § 876(b) is still useful authority on the elements of common law aiding and abetting the breach of a fiduciary duty.

cient. *Id.* at 495–98. A plaintiff must show that the attorney defendant rendered "substantial assistance" to the breach of duty, not merely to the person committing the breach.[13] *Id. See also Witzman,* 601 N.W.2d at 188 ("substantial assistance" means more than providing routine professional services). In *Granewich,* the lawyers facilitated the squeeze-out, not just by providing legal advice and drafting documents, but by sending letters containing misrepresentations and helping to amend by-laws eliminating voting requirements that protected the minority shareholder's interest. 985 P.2d at 791–792.

■■■■ [¶ 45.] Another condition to finding liability for assisting in the breach of a fiduciary duty is the requirement that the assistance be "knowing." Restatement (Second) of Torts § 874 cmt. c (1979). Knowing participation in a fiduciary's breach of duty requires both knowledge of the fiduciary's status as a fiduciary and knowledge that the fiduciary's conduct contravenes a fiduciary duty. *See Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 282–83 (2dCir.1992). Although in some instances actual knowledge may be required, constructive knowledge will often suffice. *See Terrydale Liquidating Trust v. Barness,* 611 F.Supp. 1006, 1027

(S.D.N.Y.1984) (actual knowledge required under the circumstances); *Diduck,* 974 F.2d at 283–84 (duty to investigate when defendant was "on notice" that the breach may have been occurring). Constructive knowledge is adequate when the aider and abettor has maintained a long-term or in-depth relationship with the fiduciary. *See Witzman,* 601 N.W.2d at 188 (citing *Diduck,* 974 F.2d at 283–84).

■■■ [¶ 46.] In accordance with these principles, we hold that to establish a cause of action for aiding or assisting in the breach of a fiduciary duty, a plaintiff must prove that (1) the fiduciary breached an obligation to plaintiff; (2) defendant substantially assisted the fiduciary in the achievement of the breach; (3) defendant knew that the fiduciary's conduct constituted a breach of duty; and (4) damages were sustained as a result of the breach. *See Holmes v. Young,* 885 P.2d 305, 309 (Colo.Ct.App.1994) (attorney's substantial assistance is the gravamen of aiding and abetting breach of fiduciary duty (citation omitted)); *Witzman,* 601 N.W.2d at 187–188 (accountant liability) (citing Restatement (Second) of Torts § 876(b) (1977)); *Diduck,* 974 F.2d at 281–82; *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847–48 (2dCir.1987).

---

**13.** It has been suggested that an element of wrongful intent should be included as part of the "substantial assistance" requirement. *See* Barksdale, 58 Wash & Lee L Rev at 601 (analogizing aiding and abetting breach of fiduciary duty to Restatement § 57(3), advising or assisting client to dissolve a legal relationship, which requires using wrongful means). *See* Restatement (Third) of Law Governing Law § 57(3) (2000). *Cf. Skarbrevik v. Cohen, England & Whitfield,* 231 Cal.App.3d 692, 282 Cal.Rptr. 627, 639 (1991) (conspiracy: nonfiduciary attorney must act in furtherance of own financial gain). One example of wrongful intent would be when a lawyer aids and abets the breach of a fiduciary duty in furtherance of the lawyer's own self-interest. *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066, 1082 (S.D.N.Y.1987).

The receipt of legal fees may be a basis for concluding that an attorney "participated" in the client's breach of fiduciary duty for the attorney's own financial gain. *See Weingarten v. Warren,* 753 F.Supp. 491, 496 (S.D.N.Y. 1990) (allowing aiding and abetting breach of fiduciary duty claim against attorney because he reaped legal fees for twenty-eight years in representation of trustee). In most instances, however, the receipt of normal legal fees in this circumstance would not constitute a personal financial interest in the matter. *See Skarbrevik,* 282 Cal.Rptr. at 639 (defendant attorney received only modest compensation). Although not an element in proving aiding and abetting the breach of a fiduciary duty, certainly these are circumstances to consider in gauging a lawyer's alleged knowing participation and substantial assistance.

[¶ 47.] Glover recounts that shortly after incorporation, Dahl told him that the two investors, Pederson and Shepard, had decided not to proceed and that the business would be solely controlled by Dahl as a proprietorship. Because no shares were issued, Glover took the position that the company had no official existence. But we think that what Glover actually knew and what he should have known are questions of credibility. After all, Glover notarized Pederson's and Shepard's signatures on corporate documents without having them in his presence. If he did not know his client was in the midst of a swindle, he certainly knew Dahl had several questionable investment schemes in the past, leaving unhappy investors in his wake. Thus his decision to notarize these signatures may or may not have been an altogether innocuous act. Perhaps if Glover had met with Pederson and Shepard at that time, instead of simply notarizing their signatures unseen, and heard their expectations, he could have disabused them of any misunderstanding or encouraged them to seek independent legal advice. Pederson and Shepard allege that this was part of a pattern in which Glover allowed Dahl to use his legal services as a means to allow Dahl to misappropriate investor funds. The creation of a corporation with the assistance of an attorney gave a patina of authenticity to Dahl's otherwise rogue activities. Moreover, Glover listed himself as registered agent for the company. Pederson and Shepard claim that they began investing more heavily once they learned the company had been incorporated and an attorney was onboard. They say that they felt reassured upon incorporation that the business would proceed with all the formalities required of corporations.

[¶ 48.] Four months after the business was incorporated, Glover received a "gift" of office furniture from Dahl, bought with the company credit card. Glover claimed he did not know how the furniture was paid for. Accepting such a "gift" from a client like Dahl, who Glover knew had longstanding financial problems, raises a question of constructive knowledge and exposes the problem of improper, personal financial gain in assisting Dahl.

[¶ 49.] We think it also significant that Glover assisted Dahl in selling assets that were obtained with investor funds in the corporation. In a meeting with the investors and their lawyer, Glover was present when Dahl assured the investors that upon the sale, they would be receiving their money back. The next month, with Glover's help, the company's assets were sold to a Wisconsin business. Dahl and Glover had taken the position that Chem–Age Industries, Inc., was not a corporation but a proprietorship owned solely by Dahl. *See* SDCL 47–6–18, 47–6–19 (sale of substantially all assets authorization from board and resolution from shareholders). Yet Glover helped to arrange the sale of Chem–Age assets through another entity: "Byron Dahl d/b/a BMD Associates, a South Dakota sole proprietorship." Glover later testified that he did not know the relationship between BMD and Chem–Age.

[¶ 50.] Although Glover may not have taken any active role in defrauding the investor-directors and may not have owed any direct fiduciary duty to them, Dahl did owe such a duty, and a material question of fact exists on whether Glover substantially assisted Dahl in breaching that duty. It may be that Glover, as much as Pederson and Shepard, was duped by Dahl's conniving business dealings, but that is for a jury to decide.

### F.

### Conclusion

[¶ 51.] We affirm summary judgment for Glover on the claims of fraud and legal

malpractice pertaining to the individual investor-directors. Because there are genuine issues of material fact, we reverse and remand for trial the claims of conversion and aiding and abetting the breach of fiduciary duty, and if the jury concludes that Glover was in fact representing the corporation, then the jury must also decide the company's claims of malpractice and breach of fiduciary duty.

[¶ 52.] Affirmed in part, reversed in part, and remanded for trial.

[¶ 53.] GILBERTSON, Chief Justice, and AMUNDSON and ZINTER, Justices, concur.

[¶ 54.] SABERS, Justice, concurs in part and dissents in part.

SABERS, Justice (dissenting in part B. and concurring in parts C., D.1., and E.2.).

[¶ 55.] There are genuine issues of material fact whether Glover committed a fraud on the corporation and the individual plaintiffs.

[¶ 56.] The majority opinion asks the right questions and gets most of the facts correct but reaches the wrong conclusion. The majority opinion asks at ¶ 11 "... is there a question of material fact on whether Glover committed a fraud on the corporation or the individual plaintiffs?" and at ¶ 12 "Did Glover's acts or representations fall under one or more of the four categories listed in [SDCL 20–10–2]?" The answer is Yes!

[¶ 57.] Glover's acts or representations fall under SDCL 20–10–2(3): "The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact ..." The recitation of facts set forth in the majority opinion at ¶¶ 47, 48 and 49 raise genuine issues of material fact concerning fraud under SDCL 20–10–2(3) and are as follows:

[¶ 47] Glover recounts that shortly after incorporation, Dahl told him that the two investors, Pederson and Shepard, had decided not to proceed and that the business would be solely controlled by Dahl as a proprietorship. Because no shares were issued, Glover took the position that the company had no official existence. But we think that what Glover actually knew and what he should have known are questions of credibility. After all, Glover notarized Pederson's and Shepard's signatures on corporate documents without having them in his presence. If he did not know his client was in the midst of a swindle, he certainly knew Dahl had several questionable investment schemes in the past, leaving unhappy investors in his wake. Thus his decision to notarize these signatures may or may not have been an altogether innocuous act. Perhaps if Glover had met with Pederson and Shepard at that time, instead of simply notarizing their signatures unseen, and heard their expectations, he could have disabused them of any misunderstanding or encouraged them to seek independent legal advice. Pederson and Shepard allege that this was part of a pattern in which Glover allowed Dahl to use his legal services as a means to allow Dahl to misappropriate investor funds. The creation of a corporation with the assistance of an attorney gave a patina of authenticity to Dahl's otherwise rogue activities. Moreover, Glover listed himself as registered agent for the company. Pederson and Shepard claim that they began investing more heavily once they learned that the company had been incorporated and an attorney was onboard. They say that they felt reassured upon incorporation that the business would proceed with all the formalities required of corporations.

[¶ 48] Four months after the business was incorporated, Glover received a "gift" of office furniture from Dahl, bought with the company credit card. Glover claimed he did not know how the furniture was paid for. Accepting such a "gift" from a client like Dahl, who Glover knew had longstanding financial problems, raises a question of constructive knowledge and exposes the problem of improper, personal financial gain in assisting Dahl.

[¶ 49] We think it also significant that Glover assisted Dahl in selling assets that were obtained with investor funds in the corporation. In a meeting with the investors and their lawyer, Glover was present when Dahl assured the investors that upon the sale, they would be receiving their money back. The next month, with Glover's help, the company's assets were sold to a Wisconsin business. Dahl and Glover had taken the position that Chem–Age Industries, Inc. was not a corporation but a proprietorship owned solely by Dahl. *See* SDCL 47–6–18, 47–6–19 (sale of substantially all assets authorization from board and resolution from shareholders). Yet Glover helped to arrange the sale of Chem–Age assets through another entity: "Byron Dahl d/b/a BMD Associates, a South Dakota sole proprietorship." Glover later testified that he did not know the relationship between BMD and Chem–Age.

[¶ 58.] As indicated in the majority opinion, Glover notarized the signatures even though Pederson and Shepard had not signed the document in his presence. This is not only a crime but enabled Dahl to use the corporation documents to defraud Pederson and Shepard and caused them to part with an additional $140,000.

[¶ 59.] Shortly thereafter, Glover assisted Dahl in selling the assets of the corporation enabling Dahl to run off with the money. Throughout this time period, Glover was paid with corporation funds and even received a "gift" of office furniture from Dahl. None of this could have happened but for Glover's crime in notarizing the signatures, enabling the corporation to be set in motion, to purchase assets and then assist their sale by a "sole proprietorship" owned by Dahl.

[¶ 60.] Clearly, these facts raise genuine issues whether Glover aided and abetted Dahl's fraud to the corporation and to the individuals from start to finish. Specifically, genuine issues of fact arise as to Glover's suppression of the fact that the corporation assets were not owned by Dahl as a sole proprietor from the corporation, Pederson, Shepard and from the buyer of the corporation assets. This suppression enabled Dahl to walk off with the money to their detriment in violation of SDCL 20–10–2(3).

[¶ 61.] Therefore, I would reverse Issue B. Fraud and remand for a fair trial.