**2018 UT App 77**

# THE UTAH COURT OF APPEALS

KARA CATTANI, AS TRUSTEE OF THE OATES FAMILY TRUST,
Appellant,
*v.*
LYLE DRAKE, DURHAM JONES & PINEGAR PC, DANIEL MAYNARD,
AND MAYNARD CRONIN ERICKSON CURRAN & SPARKS PLC,
Appellees.

Opinion
No. 20150673-CA
Filed April 26, 2018

Fifth District Court, St. George Department
The Honorable Pamela G. Heffernan
No. 110500394

Grant M. Sumsion, Jason S. Crandall, Daniel L.
Steele, and John J. Egbert, Attorneys for Appellant

Matthew L. Lalli and Jeremy J. Stewart, Attorneys for
Appellees Lyle Drake and Durham Jones
& Pinegar PC

John A. Snow and Alex B. Leeman, Attorneys for
Appellees Daniel Maynard and Maynard Cronin
Erickson Curran & Sparks PLC

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN and JILL M. POHLMAN
concurred.

MORTENSEN, Judge:

¶1     A dispute amongst beneficiaries of a trust has resulted in
two lawsuits, the second of which comes before us on appeal.
Kara Cattani, as the current successor trustee of the Oates Family
Trust (the Trust), appeals the district court's dismissal of some of
the Trust's claims and the court's grant of summary judgment in
favor of defendants Lyle Drake, Durham Jones & Pinegar PC,

Daniel Maynard, and Maynard Cronin Erickson Curran & Sparks PLC. We affirm as to Maynard and Maynard Cronin Erickson Curran & Sparks, but we reverse in part on claims against Drake and Durham Jones & Pinegar and remand.

## BACKGROUND

¶2    In 1971, Ernest and Florence Oates created the Trust to help ensure they were properly cared for during their lifetimes.[1] Upon the death of either settlor, the Trust was to become irrevocable. Ernest[2] died in 1996. The Oateses named their four children—Ernest Donald Oates (Oates), Caroline Woolley, Irene Cattani, and Diane Nolen—remainder beneficiaries of the Trust. Oates and Woolley died in a car accident, and Irene Cattani later suffered an unrelated injury that left her disabled and unable to manage her affairs. Irene Cattani has five children who are also

---

1. While the Trust instrument provides that it should be governed by California law, neither party argues that California law should be applied rather than Utah law. In such a situation, we assume that another state's law is the same as ours, unless a party points to the contrary. Therefore, we proceed under the assumption that Utah law applies in this case. *See Dickson v. Mullings*, 241 P. 840, 842 (Utah 1925) ("It also is well settled in this jurisdiction that, in the absence of proof, it will be presumed that the law of another state is the same as the law of the forum and the court will administer and apply the law of the jurisdiction until the law of the situs is shown. Thus, in the absence of proof, it will be presumed that the law of [the other state] on the subject is the same as the law of Utah." (citations omitted)).

2. "As is our practice in cases where [multiple] parties share a last name, we refer to the parties by their first name with no disrespect intended by the apparent informality." *Smith v. Smith*, 2017 UT App 40, ¶ 2 n.1, 392 P.3d 985.

involved in this case: Kara, Kent, Keith, Kathleen, and Kyle (the Cattani children). Nolen, the only remaining child capable of doing so, served as co-trustee with Florence following Ernest's, Oates's, and Woolley's deaths.[3] Nolen became the sole trustee in 2005 when Florence died.

¶3     Ernest owned a ten-percent interest in a Colorado limited partnership prior to his death. The Cattani children contend that Ernest had informed them that the partnership interest would become Trust property upon his death. But in 1999, after Ernest's death, Florence signed a document purporting to transfer the partnership interest to Nolen as a joint tenant with Florence. When the Cattani children learned of the transfer after Florence's death, they were concerned. In 2006, Kara requested an explanation of the transfer from Nolen; Kent wrote to Lyle Drake, an attorney representing Nolen as trustee, requesting copies of all trust documents.

¶4     Drake had been retained by Florence in 2001 to assist with trust and estate matters. At that time, Florence requested that Drake prepare a document that would "transfer the Partnership Interest to Florence and Nolen as joint tenants," "apparently forgetting about the 1999 Assignment." Drake was convinced that Florence had not been unduly influenced in her decision to make the transfer and prepared the document. Florence executed the assignment, although, as Drake explained, ultimately it "was inoperative and redundant due to Florence's prior execution of the 1999 Assignment" to Nolen as joint tenants.

¶5     Following Kara and Kent's requests for information in 2006, Drake advised Nolen that she had a duty to provide a trust accounting as of the date of Florence's death, but not for "the period prior to Florence's death." Drake then sent a letter to all

---

3. Following Ernest's death, Oates acted as Florence's co-trustee for a time.

the beneficiaries of the Trust and Florence's estate—including Nolen and the Cattani children—taking the position that any "request of past accountings is silly."

¶6     During this same time, Nolen retained an attorney, Daniel Maynard, to represent her personally. Maynard's initial focus was on the issue of ownership of the partnership interest; he did not advise Nolen regarding her duties as trustee of the Trust. Because of "stress she was experiencing" in her role as trustee, Maynard advised her to resign, but Nolen declined this advice. Nolen used the Trust to pay for her personal legal fees.

¶7     In 2006, Irene and the Cattani children sued Nolen and Drake (the 2006 case).[4] They sought to have Nolen removed as trustee, to obtain an accounting, and to have the partnership interest transferred to the Trust. They also asserted claims against Drake for legal malpractice, breach of fiduciary duty, and aiding and abetting Nolen in her breach of fiduciary duty. The district court ordered the accounting; replaced Nolen as trustee with a third-party successor trustee, Stagg Eldercare Services (Stagg); and found that Nolen "had breached her fiduciary duty to provide an accounting of the Trust for the period prior to Florence's death" when Nolen had been co-trustee. It dismissed the claims against Drake for legal malpractice and breach of fiduciary duty because he did not have an attorney-client relationship with the beneficiaries and owed them no duty.

¶8     The district court also found that because the partnership interest passed to Florence upon Ernest's death, it never became a trust asset. The court further granted summary judgment in

---

4. The suit was brought against both Drake and his law firm, Durham Jones & Pinegar PC. We refer to Drake individually and Durham Jones & Pinegar PC and Drake collectively as "Drake." Drake withdrew as attorney for the Trust when the 2006 case was filed.

favor of Nolen for all claims resting on the allegedly unlawful transfer of the partnership interest, and on the one remaining claim against Drake—aiding and abetting Nolen's breach of her fiduciary duty in refusing to provide the accounting.

¶9 Stagg, having become successor trustee and substituted as plaintiff, thereafter amended the complaint against Drake and Nolen.[5] Stagg and Nolen settled the additional claims raised against Nolen, and the 2006 case was dismissed with prejudice in December 2011. No appeal followed the dismissal. Around that same time, Stagg withdrew as trustee and Kara became successor trustee.

¶10 After the 2006 case settled, the Cattani children asserted claims against the Trust seeking reimbursement of their costs and legal fees in bringing suit against Nolen and Drake. The Trust settled these claims and agreed to reimburse the Cattani children with the Trust's funds.

¶11 In January 2010, Stagg, as trustee, sued Drake on behalf of the Trust (the 2010 case). The 2010 case also included Maynard as a defendant.[6] Stagg asserted claims for malpractice, breach of contract, constructive trust, unjust enrichment, and breach of

---

5. The Cattani children assigned to Stagg all of the claims they had asserted, including their claims against Drake that had been dismissed. Stagg's amendment did not assert any new claims against Drake but instead reincorporated the beneficiaries' previously asserted malpractice, breach of fiduciary duty, and aiding and abetting claims "to avoid any argument that those claims ha[d] been voluntarily dismissed or abandoned," and to ostensibly preserve claims for appeal.

6. The suit was brought against Maynard and his firm, Maynard Cronin Erickson Curran & Sparks PLC. We refer to Maynard individually and his firm and him collectively as "Maynard."

fiduciary duty. It also alleged that Maynard was liable for aiding and abetting Nolen's alleged breach of her fiduciary duties.

¶12    Drake moved to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure, arguing that the 2006 case foreclosed the claims against him. The district court granted the motion in part, concluding that the 2006 case precluded any claims dealing with the partnership interest, but allowed the 2010 case to proceed, provided the "claims going forward be based solely on other allegations of wrongdoing not related to the Partnership Interest."

¶13    In November 2012, Kara, as successor trustee, filed an amended complaint.[7] Drake eventually moved for summary judgment, as did Maynard. The court granted the motions, and Kara, on behalf of the Trust, appeals.

ISSUES AND STANDARD OF REVIEW

¶14    The Trust first argues that the district court erred by dismissing its claims against Drake regarding the advice he provided Nolen about the partnership interest. The Trust next argues that the district court erroneously granted summary judgment on the remaining claims against Drake. Finally, the Trust argues that the district court erred in granting summary judgment on its claims against Maynard. "A district court's ruling on either a motion to dismiss or a motion for summary

---

7. Stagg purportedly filed the amended complaint as plaintiff, but the Cattani children later disclosed that at the time the complaint was filed, Stagg had already been removed as trustee. Two weeks after filing the amended complaint, Kara filed a motion to substitute herself for Stagg as the real party in interest. The court granted the motion, and Stagg was removed as a party to the litigation. From that point on, Kara acted as both trustee and plaintiff.

judgment is a legal question which we review for correctness[.]" *Commonwealth Prop. Advocates, LLC v. Mortgage Elec. Registration System, Inc.*, 2011 UT App 232, ¶ 6, 263 P.3d 397.

ANALYSIS

I. Motion to Dismiss

¶15 The Trust urges us to reverse the district court's dismissal of claims against Drake that are related to the partnership interest "and any issues that flow from it, including [the Trust's] claims against [Drake] regarding conflicts of interest or breaches of fiduciary duty that are based upon the transfer of the Partnership Interest to Diane Nolen and the efforts of Ms. Nolen to retain that Partnership Interest." The district court's reasoning was that the court in the 2006 case had already determined Nolen could not have breached any fiduciary duties by acquiring the partnership interest because that interest was not a trust asset. Thus, there was no breach relating to the advice given by Drake concerning that interest. The district court particularly decided that it would not retry this issue because there was "sufficient privity between the beneficiaries who were plaintiffs in [the 2006 case] and the Trustee who is Plaintiff in this case that they should be considered the same for purposes of collateral estoppel."

¶16 Collateral estoppel bars relitigation of "facts and issues in [a] second suit that were fully litigated in the first suit." *Searle Bros. v. Searle*, 588 P.2d 689, 690 (Utah 1978). To establish that collateral estoppel applies, a party must meet a four-part test asking whether (1) the issue decided in the prior adjudication was identical to the one presented in the action in question, (2) there was a final judgment on the merits, (3) the issue was "competently, fully, and fairly litigated in the previous action," and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party in the prior adjudication. *See Tangren Family Trust v. Tangren*, 2016 UT App 163, ¶ 16, 381

P.3d 1152 (cleaned up). There is little dispute that the district court in the 2006 case directly ruled that the partnership interest passed to Florence Oates individually and was never part of the Trust. That ruling ultimately resulted in a final order when the then-existing parties settled the 2006 case.

¶17　The focus of the appeal of Drake's motion to dismiss is the district court's determination regarding the final prong of the four-part test—that Kara, the trustee plaintiff in the 2010 case, was in privity with the beneficiary plaintiffs, the Cattani children, in the 2006 case. The Trust challenges that determination, arguing that "the plaintiffs in the prior action had a very different relationship to the subject matter of the litigation against Drake than the Trustee has in this case."[8] We disagree with the Trust for several reasons. First, as the district court determined, the beneficiaries in the 2006 case and the Trust in the 2010 case have aligned interests, which is sufficient privity. Second, while not articulated by the district court, we determine that it is apparent on the record here that collateral estoppel applies because the Trust is a party in both cases.

---

8. Drake also claims that in "granting Drake's motion to dismiss on this issue, the district court did not dismiss any of [the Cattani children's] causes of action, but instead disallowed [the Cattani children] from basing those causes of action on the Partnership [Interest] allegations." Whether the grant of the motion to dismiss means the claims were dismissed or were simply "disallowed," the result remains the same. The district court decided that because there was privity between the plaintiffs in each case, it would not consider claims related to the partnership interest. We also note Drake's use of "the Cattanis," while perhaps employed for rhetorical purposes, is done in error. We recognize that the Cattani children are not parties to this suit, which was brought solely by Kara in her role as trustee. We nevertheless quote Drake's argument as it appears in his brief.

¶18 As to privity, our supreme court has clarified, "This means that the plea of collateral estoppel can be asserted only against a party in the subsequent suit who was also a party or in privity with a party in the prior suit." *Searle Bros.*, 588 P.2d at 690–91. "The legal definition of a person in privity with another, is a person so identified in interest with another that he represents the same legal right. Thus, privity depends mostly on the parties' relationship to the subject matter of the litigation." *Press Publ'g, Ltd. v. Matol Botanical Int'l, Ltd.*, 2001 UT 106, ¶ 20, 37 P.3d 1121 (cleaned up). For example, in *Hansen v. Bank of New York Mellon*, 2013 UT App 132, 303 P.3d 1025, this court determined that a bank as a beneficiary under Hansen's trust deed represented the same legal interests in a state court action as did the trustee under the trust deed in a prior federal suit. *Id.* ¶¶ 7–10. Hansen had sued the bank in federal court to prevent a foreclosure on his property on the basis that the bank did not own a legal interest in the property. *Id.* ¶ 3. The federal suit was dismissed with prejudice. *Id.* Hansen had simultaneously filed an action in state court asserting a claim against the trustee on the trust deed. *Id.* ¶ 4. The state court dismissed Hansen's claims regarding the foreclosure proceedings on the basis that they had already been decided in the federal court case. *Id.* Hansen argued on appeal that only the beneficiaries had been parties in the federal suit and that the trustee's interest was "substantively different from that of a beneficiary." *Id.* ¶ 9. This court disagreed and looked at the remedy Hansen sought—preventing foreclosure—and whether the interests of the trustee and the beneficiaries were aligned on this issue, ultimately determining that the beneficiaries and the trustee were in privity. *Id.* ¶ 10.

¶19 That same principle applies here. In the 2006 case, before it was fully resolved by settlement, the district court directly ruled that the partnership interest was never part of the Trust. The Cattani children, including Kara, vigorously opposed that determination. The identical legal issue was in question in the 2010 case: whether the partnership interest was part of the Trust. There, the Trust—through its trustee, Kara—argued that the partnership interest was never part of the Trust. Because the

interests of the Cattani children and the Trust were aligned on this issue, and because the court previously ruled on the issue in the 2006 case, the district court in the 2010 case was correct in determining that sufficient privity existed and collateral estoppel applied.

¶20 But of equal importance is the fact that, after Nolen was removed as trustee in the 2006 case, Stagg substituted as trustee for the Trust. Stagg, on behalf of the Trust, filed an amended complaint and reasserted all claims for the purpose of avoiding any argument that the claims had been abandoned and expressly to preserve all claims for appeal. Thus, the Trust was an actual party to the 2006 case where the issue of whether the partnership interest was part of the Trust was fully litigated. Therefore, it is unnecessary to even reach the issue of privity given that the Trust was a party in both cases. Although this argument was not raised by the parties in their briefs, it is clearly apparent in the record. "It is well established that an appellate court may affirm a judgment if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the [district] court to be the basis of its ruling or action." *Scott v. Scott*, 2017 UT 66, ¶ 18 (cleaned up).

¶21 The Trust also asserts that collateral estoppel cannot apply because the issues in the 2006 case and the 2010 case are not identical. Specifically, the Trust contends that because the 2006 case did not address the issue of whether Nolen unduly influenced Florence to persuade her to transfer the partnership interest to Nolen, the issue presented in the current case was never decided. We reject this assertion. The discrete issues in the 2006 case were (1) whether the partnership interest should have passed to the Trust as a matter of law and (2) whether Nolen breached her fiduciary duty by accepting ownership of the partnership interest. The claim at issue in the present case is whether Drake is liable for advice he purportedly gave or did not give Nolen regarding retention of the partnership interest. While at first blush this issue might appear distinct from the two issues decided in the 2006 case, we conclude that the Trust is, in

actuality, simply repackaging its earlier claim by altering an underlying theory while seeking an identical remedy; this cannot result in the escape from collateral estoppel.

¶22 The district court in the 2006 case concluded that, as a matter of law, the Cattani children had not established that Nolen breached any fiduciary duty in obtaining the partnership interest. Now, the Trust contends that this conclusion had nothing to do with whether Nolen "acquire[d] the partnership interest through undue influence." This contention is perplexing. To accept it, we would have to conclude that Nolen could have exerted undue influence in keeping an asset from the Trust while simultaneously not breaching her fiduciary duties as trustee. Such a conclusion would defy logic. *Cf. Close v. Adams*, 657 P.2d 1351, 1353 (Utah 1983) (concluding that the doctrine of constructive trust was inapplicable where a conveyor "was free of undue influence of the family" and comparing that situation to other case law where a party "did not engage in any fraud, bad faith or breach of a fiduciary responsibility"). And while there are several ways a trustee could breach her fiduciary duties without exerting undue influence, *see Haws v. Jensen*, 209 P.2d 229, 232 (Utah 1949) (concluding that a breach of "the confidential relation consist[ed] merely in the failure of the transferee to perform his promise," "even though he was not guilty of undue influence in procuring the conveyance"),[9] we

9. *See also Powell v. Moore*, No. W199800001COAR3CV, 2000 WL 286729, at *4 (Tenn. Ct. App. Feb. 17, 2000) (explaining that a trustee breached relevant fiduciary duties "by overreaching and exerting undue influence"); *Daily v. Wheat*, 681 S.W.2d 747, 758 (Tex. App. 1984) (concluding that a trial court did not abuse its discretion by severing claims where the decision was based on a conclusion "that any questions regarding a breach of fiduciary duties could be addressed within the context of undue influence"); *cf. Sinclair v. Bloom*, No. 94 C 4465, 1995 WL 348127, at *7 n.7 (N.D. Ill. June 8, 1995) ("A claim that an attorney exercised undue influence may also be stated as a claim for a

(continued…)

cannot conceive of a situation where the opposite would be true. Said another way, by concluding that Nolen breached no fiduciary duty in obtaining the partnership interest, the district court in the 2006 case implicitly concluded that Nolen exerted no undue influence. The Trust is therefore collaterally estopped from asserting any claim against Drake that rests on its claim, litigated in the 2006 case, that Nolen exerted undue influence over Florence.

¶23    Accordingly, having been a party to the prior action where the district court decided the issue of the partnership interest, and where the other elements of collateral estoppel apply, the district court's conclusion that any issue stemming from the transfer of the partnership interest could not be relitigated was correct. Further, because the partnership interest was not part of the Trust, and because Nolen obtained the interest without breaching her fiduciary duties as trustee, any advice Drake may have given regarding that interest was not actionable as a matter of law. We therefore affirm the district court's decision on this issue.

## II. Drake's Motion for Summary Judgment

¶24    In granting Drake's motion for summary judgment, the district court made four separate legal conclusions, and the Trust takes issue with all of them. First, the court determined that, as a matter of law, Drake was not negligent in advising Nolen that she need not provide an accounting of the Trust for the period of time prior to Florence's death. Second, the court determined that

---

(…continued)

breach of fiduciary duty."). *But see Cloud v. United States Nat'l Bank of Oregon*, 570 P.2d 350, 354 (Or. 1977) (explaining the court "cannot agree" with plaintiff's contention "that a finding of . . . undue influence . . . is equivalent to finding that the trustee has breached its fiduciary obligation to the beneficiaries of the trust").

regardless, "Drake was within the bounds of judgmental immunity which protects attorneys who make judgments that may later be found to be in error, but are based on uncertain, ambiguous, or otherwise unclear principles." Third, the court determined that there was "no proof" supporting the Trust's claims that Nolen misused $200,000 of the Trust's funds nor of Drake's knowledge of the alleged misuse. Fourth, the court determined that claims of negligence against Drake for advice surrounding the partnership interest "should not even be raised" given its earlier ruling that the issues were barred by collateral estoppel. We consider each of these points in turn.

A.      Advising Nolen Against Providing Accounting

¶25    The district court pointed out that it is undisputed that Drake advised Nolen not to provide an accounting to the remaining beneficiaries of the Trust for the time period prior to Florence's death. However, the court went on to determine, "A clear reading of the [Trust] leads the court to the conclusion that the requested accounting was not required." Thus, in the court's view, Drake was entitled to judgment as a matter of law on this point.

¶26    The Trust asserts that the grant of summary judgment was erroneous. "At the very least," it argues, "there are factual issues as to whether Drake's services fell below the standard of care."

¶27    "Ordinarily, whether a defendant has breached the required standard of care is a question of fact for the jury." *Jackson v. Dabney*, 645 P.2d 613, 615 (Utah 1982). "A genuine issue of fact exists where, on the basis of the facts in the record, reasonable minds could differ on whether defendant's conduct measures up to the required standard." *Id.* However, "the question of whether an attorney made an erroneous legal interpretation is a question of law," and "we will afford the [district] court's decision no deference but review it for

correctness." *Watkiss & Saperstein v. Williams*, 931 P.2d 840, 846–47 (Utah 1996).

¶28    The district court determined in the 2010 case that because Drake properly interpreted the Trust instrument's terms in advising Nolen that she need not provide an accounting for the time period before Florence's death, his conduct was reasonable. But, like the district court in the 2006 case, we disagree and conclude that the Trust instrument in fact required such an accounting; therefore, the district court's determination in the 2010 case cannot stand.

¶29    Two provisions of the Trust instrument are central to this case as it relates to the Cattani children's request for an accounting. One provision directs, "Accounting shall be made only to the oldest adult beneficiary of any trust hereunder at such time as said beneficiary shall demand." Kent made his request for accounting on behalf of his mother, the oldest adult beneficiary of the Trust. But Nolen, relying on Drake's interpretation of another trust provision, took the position that she need not provide an accounting from 1999, when she became Florence's co-trustee, to 2005, when Florence died. That provision reads, "Any successor Trustee hereunder shall be liable and responsible only for such assets as are actually delivered to him, without obligation to make accounting for all assets originally in the hands of a predecessor Trustee." We cannot read this provision to support Drake's, or the district court's, interpretation and resulting conclusion that the requested accounting was not required.

¶30    Under the relevant trust provisions, Nolen was required to provide the requested accounting.

> We employ familiar principles of contract interpretation when construing trust instruments. We begin our analysis with the language of the trust agreement to ascertain the intent of the settlor. Because we presume that the settlor knew

and intended the legal effect of the language used, we give the words used in the trust agreement their ordinary and usual meaning.

*Dahl v. Dahl*, 2015 UT 79, ¶ 29 (cleaned up).

¶31 The parties agree that Nolen was a successor trustee. The dispute, then, is over the trust's direction that Nolen "be liable and responsible only for such assets as are actually delivered to" her and that she not have an "obligation to make accounting for all assets originally in the hands of a predecessor Trustee." We consider each of these phrases in turn.

¶32 When a successor trustee becomes such, she becomes a steward of the trust assets. *Cf. Pepper v. Zions First Nat'l Bank, NA*, 801 P.2d 144, 151 (Utah 1990) ("A successor trustee is liable for breach of trust if he neglects to take proper steps to compel his predecessor to deliver the trust property to him." (cleaned up)). And the trust instrument essentially adopts an approach used by jurisdictions throughout the country—that "a successor trustee is only responsible for the assets which come into his or her hands and has no particular legal duty to seek an accounting from his or her predecessors." 90A C.J.S. *Trusts* § 346 (2018). The assets "actually delivered to" Nolen were all assets belonging to the Trust at the time she became co-trustee. And, under the terms of the trust instrument, she was "liable and responsible" only for those assets; she had no liability or responsibility for assets that had once been part of the Trust and no longer were. In other words, Nolen was responsible for all property belonging to the Trust beginning on the date in 1999 when she became Florence's co-trustee.

¶33 The question then becomes whether Nolen was required to provide an accounting for trust assets she received and was responsible for dating back to 1999 or whether her obligation to provide an accounting arose only after Florence died in 2005. Said another way, we must determine whether the trust

instrument allowed Nolen to administer trust assets without requiring her to account for them.

¶34 The trust instrument itself established that Nolen had no "obligation to make accounting for *all* assets originally in the hands of a predecessor Trustee." (Emphasis added.) Read in context with the rest of the trust provision where that phrase appears, it is clear that Nolen had an obligation to account only for trust assets that were actually delivered to her—for which she was liable and responsible. No one could require her to account for the entirety of assets held by her predecessors.

¶35 This determination is based on the provision's use of the word "all." That word can mean "the whole amount or quantity" or it can mean "every member or individual component." *All*, Webster's Third New Int'l Dictionary 54 (1971). The proper interpretation of the trust instrument requires us to decide whether the word "all" means the *entirety or "whole amount" of* "assets originally in the hands of a predecessor Trustee" or *any one of the individual* "assets originally in the hands of a predecessor Trustee."

¶36 Case law has acknowledged that sometimes "any" and "all" are synonymous. *See Graves v. North E. Services, Inc.*, 2015 UT 28, ¶ 52 & n.4, 345 P.3d 619 (discussing the "broad, encompassing import of" the word "any" and collecting cases interpreting the term broadly). But our supreme court has also recognized that sometimes "all" and "any" do not mean the same thing. *See In re General Determination of Rights to the Use of Water*, 2004 UT 106, ¶¶ 23–24, 110 P.3d 666 (interpreting a statute's use of the word "any" and discussing how the operation of that statute would change if the legislature had instead used the word "all"); *Dowling v. Bullen*, 2004 UT 50, ¶ 11, 94 P.3d 915 (rejecting an "argument that the inclusion of the word 'any' in [a particular section] reveals the legislature's intent that the [Utah Health Care Malpractice Act] apply to every cause of action involving the provision of health care services by a health care provider").

¶37    Given the context in which the word "all" appears in the relevant trust provision, we conclude that it does not mean "any"; instead, it references the entirety of trust assets held by a predecessor trustee—the comprehensive body of assets that Nolen's predecessor originally had in his hands. It does not mean each asset in the predecessor's hands, considered individually. Thus, if a particular asset were delivered to Nolen as trustee, becoming an asset for which she was responsible for, she would be expected to account for that asset. What she was not expected to do was look back at that comprehensive body of assets that existed before she succeeded as trustee and account for it. To conclude otherwise would yield an illogical result. It would allow any successor trustee to administer trust assets without ever needing to account for that administration, so long as the assets being used became part of the trust before the successor trustee assumed her role.

¶38    Because the Cattani children in the 2006 case sought an accounting from 1999 to 2005, when Nolen acted as co-trustee, they were entitled to an accounting for that period. And Nolen, as successor trustee at that time, had an obligation to provide an accounting for *all* trust assets that had been delivered to her. Drake misinterpreted the trust provision and erroneously advised Nolen not to provide the requested accounting. The district court similarly misinterpreted the trust terms. Under these circumstances, we reject the district court's determination "that the requested accounting was not required" and reverse its grant of summary judgment in Drake's favor.

B.    Judgmental Immunity

¶39    The district court separately concluded that "[i]f there was any ambiguity" regarding whether the accounting was required, "Drake was within the bounds of judgmental immunity which protects attorneys who make judgments that may later be found to be in error, but are based on uncertain, ambiguous, or otherwise unclear principles. For this reason [the

Trust's] claim fails." The Trust suggests, "That ruling is a misapplication of the judgmental immunity defense."

¶40 The judgmental immunity doctrine, as it exists in our jurisprudence, comes from *Watkiss & Saperstein v. Williams*, 931 P.2d 840 (Utah 1996). In that case, our supreme court explained that in a legal malpractice context, "[i]f the plaintiff successfully shows that his attorney erred under applicable law, it is well recognized that the attorney may still avoid liability by showing that his error was the result of an uncertain, unsettled, or debatable state of the applicable law." *Id.* at 846. Whether an attorney's "error was caused by vagaries in the law raise[s] questions of law to be decided by the court." *Id.* "On appeal, we apply the same standards. Because the question of whether an attorney made an erroneous legal interpretation is a question of law, we will afford the trial court's decision no deference but review it for correctness." *Id.* at 846–47.

¶41 While the doctrine of judgmental immunity remains relatively unexplored by Utah's appellate courts, *Watkiss* makes clear that (1) an attorney seeking to avoid liability has the burden of showing that the immunity applies and (2) the doctrine applies where the attorney's error was due to the fact that the state of the law applicable to the underlying case is "uncertain, unsettled, or debatable."[10] *Id.* at 846.

---

10. The *Watkiss* court also suggested that to qualify for judgmental immunity, the lawyer may have to demonstrate that the lawyer "perform[ed] the research and investigation necessary to make an informed judgment. This is so that the lawyer will follow the best and most logical interpretation out of a number of reasonable interpretations." *Watkiss & Saperstein v. Williams*, 931 P.2d 840, 851 (Utah 1996) (citations omitted). Because we conclude that Drake has not demonstrated that the law he applied was unclear or unsettled, we need not resolve whether he met this standard.

¶42 In his memorandum supporting his motion for summary judgment, Drake asserted judgmental immunity as a defense. He argued that the defense applied because "the law is unclear, unsettled by case law, and is an issue or issues upon which reasonable doubt may well be entertained by informed counsel." (Quoting *Bergstrom v. Noah*, 974 P.2d 531, 557 (Kan. 1999).) He also argued that his representation included "at least reasonable advice in an unsettled area of the law, and cannot, therefore, constitute a breach of any duty." But Drake (and likewise the district court) never identified what area of the law was unsettled or unclear, and how that led to his error. Further, in asserting judgmental immunity, Drake conflated the question of professional negligence with the applicability of a defense against a claim of negligence. He argues that his advice was reasonable, which speaks to the question of breach, an element of negligence; that the advice was given in an unsettled area of the law, which speaks to the applicability of a judgmental immunity defense; and concludes that there was no breach of duty, which goes back to whether Drake was negligent in his representation. Given his inability to articulate how he was protected by judgmental immunity, we cannot conclude that he met his burden of "showing that his error was the result of an uncertain, unsettled, or debatable state of the applicable law." *See Watkiss*, 931 P.2d at 846. The district court's ruling likewise fails to identify what law was uncertain, unsettled, or debatable such that a court could conclude as a matter of law that judgmental immunity applies.

¶43 The district court's ruling that "Drake was within the bounds of judgmental immunity" is conclusory at best. Our rules require that when a motion for summary judgment "is based on more than one ground, the court must issue a brief written statement of the ground for its decision." Utah R. Civ. P. 52(a)(6). In other words, while the district court was free to be brief in its reasoning, it was nevertheless required to provide its reasoning when the motion with respect to this claim was based on multiple grounds. And if its reasoning for applying judgmental immunity is different from what we are able to

discern from its written ruling, it failed to comply with rule 52 of the Utah Rules of Civil Procedure. *See id.*

¶44    Drake failed to show how the state of the law—relevant to his interpretation of the trust instrument—was uncertain, unsettled, or debatable. And the district court did not appear to consider whether the law was such, instead applying judgmental immunity because it had determined that Drake was entitled to advise Nolen not to provide an accounting of the trust assets for the time prior to Florence's death—a determination reversed above. Under the record before us, the judgmental immunity rule does not apply, and we reverse the district court's alternative grounds for granting Drake summary judgment.

C.    Nolen's use of $200,000 from trust funds

¶45    The district court concluded that "Drake breached no duty to inform Nolen of a conflict of interest and a duty to resign under" the circumstances of this case. One of those circumstances was Nolen's alleged misuse of $200,000 of trust funds. In the district court's view, "there is no proof even to this day despite over seven years of litigation, that this is true." The Trust asserts, "That finding is obviously wrong." Because this appears to either be a finding of fact inappropriately made on summary judgment, *see Berenda v. Langford*, 914 P.2d 45, 54 (Utah 1996) (explaining that "factual findings . . . preclude summary judgment in all but the clearest of cases"), or an oversight of evidence presented that created a dispute of fact, we agree with the Trust.

¶46    Kyle filed a declaration outlining irregularities he found in documents he obtained from Nolen. One such irregularity was the apparent use of trust funds to pay Nolen's "personal mortgage monthly payment on numerous occasions" and "for numerous personal expenditures." Furthermore, Nolen had provided a preliminary accounting in the 2006 case, which was before the district court in the present case. The Trust argues that the accounting demonstrates Nolen's misuse of trust funds and

that "even if Drake can point to contrary evidence, that would simply result in a disputed fact, the existence of which precludes summary judgment." We agree. *See Nyman v. McDonald*, 966 P.2d 1210, 1213 (Utah Ct. App. 1998) ("One sworn statement under oath involving a material fact is all that is necessary to create a factual issue, thereby precluding summary judgment." (cleaned up)). The district court therefore erred when it concluded that no evidence existed to support the Trust's claim that Nolen had misused trust funds.

¶47 The district court later concluded, in the alternative, that even if such evidence existed, "there is no evidence that Drake knew of the alleged misuse of trust assets." And that "absent active participation and knowledge of a breach of fiduciary duty by the trustee, the attorney cannot be held responsible to third parties, even beneficiaries."

¶48 One of the misuses the Trust alleged was that Nolen had used trust funds to pay her personal attorney fees. Maynard, Nolen's personal attorney, testified in his deposition that Nolen "had been told by counsel from Utah that she should pay [him] from the trust."[11] Given this testimony, there is at least a dispute of fact regarding whether Drake knew of Nolen's misuse of trust funds relative to her attorney fees, and, viewing the evidence in the light most favorable to the Trust, there is also the suggestion that Drake actively participated in that activity. Because there was a dispute of fact preventing summary judgment on this issue, the district court erred in granting summary judgment in favor of Drake.

---

11. Drake has suggested no other plausible interpretation of "counsel from Utah" than that Maynard was referring to him. And while we recognize that the evidence appears to be rank hearsay, there was no objection below, and indeed, Drake invited the court to accept the factual assertions as true. Drake instead argued below that assuming those facts as true, he should prevail as a matter of law.

D.     Advice Regarding the Partnership Interest

¶49     The district court rejected the Trust's claims "that Drake negligently advised Nolen that she didn't have a conflict of interest when she retained the . . . partnership interest." The district court based this rejection on the fact that it had "previously ruled" that the partnership interest was not a trust asset and that it had "also ruled in this case that those claims should not even be raised." In other words, the summary judgment ruling on these particular claims was premised on the district court's earlier determinations that collateral estoppel acted to bar the claims. As we have already explained, the district court correctly concluded that collateral estoppel applies to this case. *See supra* ¶¶ 16–23. And because we concluded that the district court's collateral-estoppel determinations were correct, we also affirm the district court's grant of summary judgment on the claims based on the partnership interest.[12]

III. Maynard's Motion for Summary Judgment

¶50     After granting summary judgment in favor of Drake, the district court received Maynard's motion for summary judgment. In deciding Maynard's motion, the district court categorized the claims against Maynard in the following ways: legal malpractice claims, unjust enrichment and constructive trust claims, and the aiding and abetting claim. The district court granted summary judgment on all claims. On appeal, the Trust does not challenge summary judgment on the legal malpractice claims and we therefore do not address them.

---

12. It strikes us as odd that a district court would grant summary judgment on claims it had already dismissed, but our reading of the summary judgment ruling seems to suggest that this is what happened here and so we conclude the district court got it right—twice.

### A. Unjust Enrichment and Constructive Trust

¶51 The Trust asserted a claim of unjust enrichment and sought the equitable relief of a constructive trust for "legal fees paid by Nolen to Maynard out of Trust assets." "There is no dispute that Maynard performed the legal services for Nolen and that he was paid by Nolen from Trust assets." Thus, the central question before the district court was whether Maynard was unjustly enriched by his receipt of those funds and, if not, was thus entitled to judgment as a matter of law. *See* Utah R. Civ. P. 56(a) (summary judgment shall be granted "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law").

¶52 On appeal the Trust asserts that the district court erroneously granted summary judgment by concluding that the Trust waived its claims against Maynard by way of the settlement and that the settlement agreement operated as a release of Maynard under Utah Code section 15-4-5. But in attacking these conclusions, it ignores the primary basis of the district court's ruling. The district court in its memorandum decision stated:

> As far as unjust enrichment goes, it appears quite clear that if anyone was unjustly enriched it was *Nolen*. This is especially true if [the Trust] takes the position that Nolen did not reimburse her for those legal fees in the settlement. If she did not, and [the Trust] is correct that she should not have used Trust funds to pay those fees, then she has received free legal services. That would be unjust enrichment indeed.
>
> [The Trust] has focused [its] attention on the wrong party by suing Maynard for the fees that he was paid while performing legal services for Nolen.

The Trust's briefs are silent as to the district court's conclusion that the Trust had sued the wrong party under the circumstances of this case. Thus, the Trust has failed to address the actual basis of the district court's decision. While the district court did address waiver and Utah Code section 15-4-5, those bases were in addition to the conclusion that the Trust had sued the wrong party. Where an appellant fails to address the basis of the district court's ruling, we reject the challenge. *Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 17, 241 P.3d 375.

¶53 Accordingly, we affirm the district court's grant of summary judgment in favor of Maynard on unjust enrichment.

B. Aiding and Abetting

¶54 In determining that Maynard was entitled to judgment as a matter of law on the Trust's aiding and abetting claim, the district court explained, "There is no reasonable evidence that Maynard even knew about the alleged misappropriations by Nolen until after the [the 2006 case] was over." Because he did not know about the alleged misappropriations, he could not have aided or abetted them. *See Mower v. Simpson*, 2012 UT App 149, ¶ 37, 278 P.3d 1076 ("[T]he gravamen of the claim of aiding and abetting a breach of fiduciary duty is the defendant's knowing participation in the fiduciary's breach." (cleaned up)). The district court separately determined that because Maynard did not act outside the scope of his representation, the "claim is not actionable in this case and summary judgment is granted."

¶55 The only evidence the Trust points to in support of its claim that Maynard knew about the alleged misappropriations is a meeting between Kent and Maynard in 2006. At that meeting, "Maynard referred to a stack of documents on his desk and stated that Kent would be surprised when he learned how much money had gone through the Trust's accounts." In the Trust's view, the district court should have inferred from this encounter "that Maynard had access to the records showing how much money had gone through the Trust, that Maynard had already

reviewed these records, and that Maynard already knew the surprising details about how much money had been spent." Even if these inferences were reasonable, they do not support a claim that Maynard was aware that Nolen had misappropriated trust funds. Knowing how much money passed through an account does not mean Maynard knew what the money was used for. And even if the Trust had shown that Maynard knew what the money was used for (which it did not), there is no evidence to suggest that Maynard knew those uses were inappropriate. We therefore affirm the district court's ruling on this point.

¶56    The Trust also argues that "even if it were true that Maynard had no knowledge that Nolen was breaching her fiduciary duty by misappropriating Trust assets for her personal use, that is no basis for granting summary judgment with respect to Nolen's other breaches of fiduciary duty of which Maynard had full knowledge." "For example," the Trust continues,

> Maynard knew of Nolen's refusal to provide the requested accounting, and he took material[] steps to assist her with that refusal. Similarly, Maynard knew that Nolen was using Trust assets to pay his invoices, even though he represented her in her personal interests against the Trust's interests. And Maynard knew that Nolen was breaching her fiduciary duty by continuing to act as Trustee despite the existence of her conflicts of interest.

The Trust makes all these assertions without citation to the record, without discussing what evidence was before the district court to support these claims, and without reference to any specific portion of the district court's summary judgment order the Trust takes issue with. For these reasons, we reject the challenge because the Trust has failed to adequately brief the issue. *See* Utah R. App. P. 24 (requiring appellate briefs to

contain appropriate headings, citation to the record, and argument with reasoned analysis).

¶57    Additionally, the district court's alternative ground for granting summary judgment stands, even if we were to assume that the Trust was correct and the evidence demonstrated Maynard's knowledge of Nolen's other breaches of her fiduciary duties. The court explained that "the law applicable to attorneys is that in order for them to be potentially liable for aiding and abetting they must have acted outside the scope of their representation and in their self-interest."

¶58    The Trust argues that the district court's order in this regard failed to follow Utah law. In the Trust's view, the rule relied upon by the court comes from "cases from other jurisdictions" that "are neither controlling nor persuasive." Maynard counters that whether we follow the law of other jurisdictions or the traditional elements of an aiding and abetting claim, the district court's grant of summary judgment should stand.

¶59    The cases relied on by each party demonstrate that differing jurisdictions disagree less about the proper elements of an aiding and abetting claim asserted against attorneys and more about whether such a claim can even be asserted against an attorney. "Utah law recognizes a cause of action for aiding and abetting the breach of a fiduciary duty." *Mower v. Simpson*, 2012 UT App 149, ¶ 38, 278 P.3d 1076. *But see Coroles v. Sabey*, 2003 UT App 339, ¶ 9 n.10, 79 P.3d 974 (noting that the district court "dismissed the claims of aiding and abetting breach of fiduciary duty and aiding and abetting fraud . . . because these claims are not cognizable under Utah law" but not analyzing or discussing this ruling on appeal (cleaned up)). But we have not found any Utah case—and the parties direct us to none—addressing the question of whether *an attorney* can be liable for the breach of a fiduciary duty on a theory of aiding and abetting.

¶60 Some jurisdictions throughout the country have answered this question in the affirmative, including some that have set forth additional elements that must be proven if such a cause of action is allowed. Those jurisdictions include Arizona, Illinois, New Mexico, Oregon, and South Dakota.[13] In other jurisdictions—such as California, Colorado, and Texas—the law is either less clear or the cause of action is not allowed.[14] We

---

13. *See Chalpin v. Snyder*, 207 P.3d 666, 677 (Ariz. Ct. App. 2008) ("reject[ing] the trial court's conclusion that aiding and abetting is not a valid cause of action against lawyers"); *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 768 (Ill. App. Ct. 2003) ("Although Illinois courts have never found an attorney liable for aiding and abetting his client in the commission of a tort, the courts have not prohibited such actions."); *Durham v. Guest*, 2007-NMCA-144, ¶¶ 14–19, 171 P.3d 756, 758 (applying the elements of the tort of aiding and abetting breach of a fiduciary duty to an attorney defendant), *rev'd on other grounds*, 2009-NMSC-007, 204 P.3d 19; *Reynolds v. Schrock*, 142 P.3d 1062, 1069 (Or. 2006) (holding "that a lawyer acting on behalf of a client and within the scope of the lawyer-client relationship is protected by . . . privilege and is not liable for assisting the client in conduct that breaches the client's fiduciary duty to a third party. Accordingly, for a third party to hold a lawyer liable for substantially assisting in a client's breach of fiduciary duty, the third party must prove that the lawyer acted outside the scope of the lawyer-client relationship."); *Chem-Age Indus., Inc. v. Glover*, 2002 SD 122, ¶¶ 44, 46, 652 N.W.2d 756 (to bring a claim of aiding and abetting a breach of fiduciary duty against an attorney defendant, the "plaintiff must show that the attorney defendant rendered 'substantial assistance' to the breach of duty, not merely to the person committing the breach").

14. *See Wolf v. Mitchell, Silberberg & Knupp*, 90 Cal. Rptr. 2d 792, 798 (Ct. App. 1999) (discussing cases addressing the question of "when actions by an attorney for a trustee will give rise to liability to a beneficiary of the trust" and explaining that "an

(continued…)

need not definitively answer the question to resolve the case before us. Assuming a cause of action for aiding and abetting the breach of a fiduciary duty can be sustained against an attorney in Utah, the Trust would need to at least demonstrate knowing participation in the breach. *See Mower*, 2012 UT App 149, ¶ 37. We have already addressed the Trust's failure to put forth evidence supporting a reasonable inference of Maynard's knowledge of Nolen's breach of her fiduciary duties. But beyond that, the Trust has not shown how Maynard *participated* in any breach. And we agree with the district court that "[s]imply

---

(…continued)

attorney may be liable to a trust beneficiary for the attorney's active participation in a trustee's breach of duty if the attorney acted in furtherance of his or her own financial gain, or committed actual fraud by making express misrepresentations to the beneficiary"); *Alexander v. Anstine*, 152 P.3d 497, 503 (Colo. 2007) ("[Saving] for another day the question of whether an attorney can ever be liable for aiding and abetting a breach of fiduciary duty to a non-client"); *Span Enters. v. Wood*, 274 S.W.3d 854, 858–59 (Tex. App. 2008) (noting that "Texas courts have refused to expand Texas law to allow a non-client to bring a cause of action for aiding and abetting a breach of fiduciary duty, based upon the rendition of legal advice to an alleged tortfeasor client" while also concluding that because the defendant's "actions were as [the alleged tortfeasor's] attorney, [the defendant's] conduct was not independent of his representation of his client" and thus "the trial court did not err by determining that [plaintiffs] failed to plead a cognizable cause of action for aiding and abetting a breach of fiduciary duty" (cleaned up)). *But see Everest Inv'rs 8 v. Whitehall Real Estate Ltd. P'ship XI*, 123 Cal. Rptr. 2d 297, 303 (Ct. App. 2002) (encouraging the California "Supreme Court to revisit these issues" and opining that "we do not see how the agent's unauthorized and self-serving act can make him liable to a third party for conspiracy to breach a fiduciary duty that he does not owe to anyone").

giving legal advice, even in the face of knowledge of the breach of the fiduciary duty" is not enough to show that Maynard participated in the breach.[15] Accordingly, we affirm the district court's grant of summary judgment in Maynard's favor.

## CONCLUSION

¶61 The district court was correct in dismissing the Trust's claims dealing with the partnership interest because the doctrine of collateral estoppel applies in this case. However, its grant of summary judgment in Drake's favor was erroneous in part because there were either issues of material fact or Drake was not entitled to judgment as a matter of law. We therefore affirm the order of dismissal but reverse the grant of Drake's motion for summary judgment. Further, we affirm the district court's grant of summary judgment in favor of Maynard.

---

15. This is supported by the law of other jurisdictions. *See Pierce v. Lyman*, 3 Cal. Rptr. 2d 236, 241 (Ct. App. 1991) ("The rendering of legal advice to the trustee was insufficient; the attorney must have actively colluded with the trustee in breaching the trustee's fiduciary duties."); *Chem-Age Indus., Inc.*, 2002 SD 122, ¶ 44 (explaining that a liable attorney must have "rendered 'substantial assistance' to the breach of duty, not merely to the person committing the breach").