#29265-aff in pt & rev in pt-JMK
**2022 S.D. 22**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

DOUG GANTVOORT,                                    Plaintiff and Appellant,

    and

DOROTHY JEAN NOVAK                                  Plaintiff,

    v.

MARY ANN RANSCHAU,                                 Defendant,

    and

DAVID R. STRAIT and
DAVID R. STRAIT, P.C.,                             Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
DEUEL COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON R. ERICKSON
Retired Judge

* * * *

ROBERT D. TRZYNKA of
Hovland, Rasmus, Brendtro
   & Trzynka, Prof. LLC
Sioux Falls, South Dakota

NANCY J. TURBAK BERRY
SEAMUS W. CULHANE of
Turbak Law Office, P.C.
Watertown, South Dakota               Attorneys for plaintiff and
appellant.

* * * *

ARGUED
NOVEMBER 17, 2020
OPINION FILED **04/06/22**

JASON R. SUTTON
THOMAS J. WELK of
Boyce Law Firm, LLP
Sioux Falls, South Dakota

Attorneys for defendants and appellees.

#29265

KERN, Justice

[¶1.]        Doug Gantvoort (Doug) sued his former wife, Mary Ranschau (Mary), and her attorney, David Strait (Strait), after Mary placed a hidden recording device in Doug's office during their tumultuous divorce. Strait accepted fifty-one recordings that Mary made of Doug, saved them onto his computers, and attempted to introduce two of them into evidence during the divorce trial. One of the recordings captured Doug's comments while viewing pornography. In another, he discussed his net worth and expressed love for his mistress. Doug brought claims against Strait asserting he intentionally invaded Doug's privacy, aided and abetted Mary in her invasion of his privacy, and, by this conduct, engaged in a civil conspiracy with Mary. The circuit court granted summary judgment in favor of Strait on all counts.[1] We reverse the entry of summary judgment on Doug's claim

---

1.    Doug, his mistress, Dorothy Novak, and his friend, Keith Diekman, initially filed suit against Strait. On June 21, 2019, all three plaintiffs filed a notice of appeal of the circuit court's entry of summary judgment. This appeal was dismissed pursuant to SDCL 15-26A-3 for failing to appeal from an order appealable as a matter of right. The circuit court subsequently filed a "Judgment and Final Order Dismissing Claims and Taxing Costs," from which only Doug filed a notice of appeal on February 27, 2020. However, the notice of appeal was signed by Dorothy's attorneys. Yet, in the appellate briefs, it appears that Doug is the only appellant. The title pages to appellant's briefs list Doug as "Plaintiff/Appellant," Dorothy as only "Plaintiff," and do not list Keith at all. The appellant's briefs refer to the "Appellant" in the singular throughout and make no arguments on Dorothy's behalf; in fact, she is referenced only in passing a few times. Therefore, it appears that Dorothy is not an appellant in this case. Even if she were, her potential arguments are waived by her failure to present any arguments or present her claims in the briefs. *See Duerre v. Hepler*, 2017 S.D. 8, ¶ 28, 892 N.W.2d 209, 220 ("It is well-settled that the failure to brief an issue and support an argument with authority waives the right to have this Court review it." (citations omitted)).

-1-

against Strait in Count 2 for aiding and abetting, but we affirm the entry of summary judgment as to Counts 1 and 3.

## Factual and Procedural Background

[¶2.] Doug and Mary married in 1996. During the course of their marriage, they owned and operated a specialty restoration business in Clear Lake, South Dakota, refurbishing antique tractors and vehicles. Mary worked as the sole employee of the business following a motorcycle accident Doug had in 2006. Sometime in late 2014, Mary began to suspect that Doug was having an affair. Mary sought advice from private investigators about how to conduct electronic surveillance of Doug. Thereafter, Mary purchased a voice-activated audio recording device and hid it in the windowsill of Doug's office.[2] On November 30, 2014, Mary began recording Doug at times when she knew he would be in the office. She would place the recording device in the room and return later to collect it and listen to the recordings.[3] Mary made a total of fifty-one recordings.

---

2. The device would automatically turn on and start recording when someone in the room spoke or made a sound, and it would turn off when no noise was detected in the room.

3. SDCL 23A-35A-20(1)–(2), which criminalizes recordings made without consent provides that:

> [A] person is guilty of a Class 5 felony who is not:
>
> (1) A sender or receiver of a communication who intentionally and by means of an eavesdropping device overhears or records a communication, or aids, authorizes, employs, procures, or permits another to overhear or record, without the consent of either a sender or receiver of the communication;

(continued . . .)

[¶3.]     Because Doug and Mary restored large antique items, the couples' business consisted mostly of an open shop area with a small, enclosed office area. The shop area had one large door which was used most often. The office area had two doors, one leading into the shop and another allowing outside access. The door leading into the shop did not have a lock, but the outside door did have a lock to which Mary had a key. The office also had windows, a desk, a computer, and other office equipment. The windows had cardboard on the inside preventing people from seeing into the office. Doug frequently spent late evenings, and occasionally, he spent nights in the office as it also had kitchen appliances, a restroom, and shower facilities. Although Mary testified at her deposition that the office was Doug's "man cave, kind of," she also testified that it was "not a man cave. It's *our* office. It's the shop. It's been a long time since it's been really opened up to the public, but yet we still have a lot of people come in . . . and they'll walk around." (Emphasis added.)

[¶4.]     Mary's recordings consisted mostly of Doug's side of telephone conversations occurring late at night, some of which allegedly involved his mistress,

---

(. . . continued)

> (2) A person present during a conversation or discussion who intentionally and by means of an eavesdropping device overhears or records the conversation or discussion, or aids, authorizes, employs, procures, or permits another to overhear or record, without the consent of a party to the conversation or discussion[.]

Further, placing such a device is a class one misdemeanor. SDCL 22-21-1(2), provides in part that:

> No person may, except as authorized by law . . . [i]nstall in any private place, without the consent of the person or persons entitled to privacy there, any device for observing, photographing, recording, amplifying, or broadcasting sounds or events in such place, or uses any such unauthorized installation.

but one of the recordings captured the sound of Doug masturbating while he viewed pornography in his office. After reviewing the first few recordings, Mary believed Doug's conversations confirmed her suspicions that Doug was having an affair because he was "setting up trips for weekends" with a woman and spoke about building a house for her. Mary contacted attorney Strait about filing for divorce.

[¶5.] On December 3, 2014, Mary and Strait met for the first time in Strait's office. Mary retained Strait to file a divorce action against Doug. During this initial consultation, Mary gave Strait her first recording from Doug's office and explained how she captured the recordings. At the behest of Mary and for preservation purposes, Strait directed his staff to download a copy of the recording to his computer system and then copy the content onto a compact disc for Mary to take with her. This practice continued several times per week over the course of the next two months. Strait's billing statements itemized the time his staff spent transferring Mary's recordings.

[¶6.] The parties dispute whether Strait told Mary during the December 3 consultation that she should stop recording Doug. Strait testified in his deposition that he told her not to record Doug for several reasons. He contends he advised Mary that recording another person without being personally present could amount to criminal conduct; that judges do not like secret recordings whether legal or not; that evidence of an affair was not the primary issue in the divorce, and that if she

recorded someone other than Doug, it could lead to problems for her including the inadvertent capturing of privileged conversations between Doug and his attorney.[4]

[¶7.]       In contrast, Mary testified that Strait did not advise her until January 2015 that she should not be recording Doug's conversations. Mary claims that she did not know it was illegal to record Doug and that Strait did not tell her that it was unlawful. She did acknowledge that Strait told her that any evidence of Doug's affair would not determine the outcome of the legal issues in the divorce. Strait's notes from his initial consultation with Mary on December 3 confirm the discussion about the recordings but are silent as to whether he advised Mary to stop recording Doug.

[¶8.]       Because Mary would drop off the recordings with Strait's staff, Strait did not personally accept the recordings Mary brought to his office. Strait's paralegal, however, sent him inter-office memorandums notifying him when Mary dropped off recordings, which summarized the information received from her.[5] For example, Mary dropped off recordings on January 12, 2015. Strait's paralegal sent him an inter-office memo that day indicating that she needed Mary's "permission to delete the files on the recorder so she can use it again." The memo also noted that: "[Mary] said Doug is getting an attorney now. She'll know soon who it is." Strait's

---

4.       Strait clarified in his deposition testimony when he said, "I didn't break it down into some sort of detailed analysis whether she should or not, I just told her 'don't do it.'"

5.       Strait denied listening to any of the tapes other than snippets of the two tapes that he proffered at trial. Additionally, Strait's paralegal listened to the recordings, but only long enough to ensure that they transferred to the computer.

paralegal stopped sending the memos sometime after January 12 because she received no feedback from Strait.

[¶9.] Strait considered the recordings to be evidence that he had a duty to preserve, even though he testified that, for the most part, he thought the recordings were irrelevant to Mary's divorce action. Prior to trial, Mary prepared a handwritten note describing the contents of the recordings that she wanted to introduce at trial and urged Strait to use those portions of the recordings in the divorce proceedings. When explaining why she wanted the recordings offered into evidence, Mary said she "wanted Doug to know the truth, that I know that he was having an affair, and that's all." Strait testified in his deposition that Mary became angry after Strait refused to reference the recordings in court documents in preparation for a February 27, 2015 hearing.

[¶10.] The parties proceeded in the divorce action on May 5–7, 2015. During the trial, Strait attempted to introduce two of the recordings made by Mary on December 17 and 18, 2014. Although the recordings totaled seven hours, Strait sought admission of only excerpts from each recording.[6] The circuit court sustained an objection to the admission of the recordings concluding that they were made in violation of SDCL 23A-35A-20. Thereafter, Strait laid further foundation and again moved to admit the tapes into evidence. The court again denied the motion.

[¶11.] Strait then marked the two tapes as exhibits 101 and 102 and made an offer of proof informing the court that the recordings contained Doug's statements,

---

6. One of the recordings contained the sounds Doug made while viewing pornography.

made presumably to his mistress, that (1) "what you did to me the other night was the greatest sexual experience of my life" and (2) "I didn't think she would do it this fast, I am exposed, may cost me a couple hundred thousand dollars, reality is I'm worth a couple of million . . . . I love you and I'm going to say we're friends, nobody would have sex with somebody that has prostrate [sic] issues, it's not good for the prosecution." The circuit court did not receive the exhibits, and they were not played at trial. At the close of the evidence, the court took the case under advisement. The circuit court issued a memorandum decision on June 2, 2015, followed by a decree of divorce on June 16, 2015.[7]

[¶12.]    Almost three years later, on January 18, 2018, Doug brought an action against Mary and Strait alleging: (1) invasion of privacy, (2) aiding and abetting invasion of privacy, and (3) civil conspiracy.[8] Mary and Strait each filed motions for summary judgment. Strait argued that his actions did not invade Doug's privacy because in rendering professional legal services, he had a duty to preserve the recordings. In addition, he argued that he owed no duty to Doug in this context. Analogizing Doug's claims to a malpractice lawsuit filed against him, Strait argued that his legal services to Mary were not intentional acts that would result in an invasion of Doug's privacy. Strait also argued that he did not aid or abet Mary's

---

7.    The circuit court noted in its opinion that the divorce was contentious and that "getting to the truth in this case where testimony conflicts, with few exceptions, borders on the impossible due to the glaring lack of credibility of both parties."

8.    On March 21, 2018, Doug filed an amended complaint adding David R. Strait, P.C., as a defendant. For purposes of this appeal both defendants are referred to as Strait, unless otherwise noted.

invasion of Doug's privacy because he did not substantially assist her in the act. As to Doug's civil conspiracy claim, Strait argued for dismissal because (1) there was no underlying tort on which to base the action, (2) Strait and Mary did not agree to commit a tort, and (3) a lawyer cannot conspire with his client both as a matter of law and under the intra-corporate conspiracy doctrine. Finally, Strait argued that any communications he made during his representation of Mary are absolutely privileged under SDCL 20-11-5(2) (detailing the statutory requirements for a privileged communication), including those made while attempting to introduce the recordings into evidence.

[¶13.] Doug resisted the motions for summary judgment, arguing that he had a legitimate privacy interest in his office and that the undisputed facts show that Mary and Strait invaded it. As for his contention that Strait aided and abetted Mary in her invasion of his privacy, Doug argued that whether Strait knew that Mary was recording Doug and whether he told Mary to stop recording were disputed questions of fact for a jury. Although Doug acknowledged that courts were divided on whether an attorney can conspire with his client, he argued that Strait conspired with Mary under the facts present here. In addition, Doug argued that the litigation privilege did not apply to Strait because he knew the recordings were irrelevant to the proceedings but tried to introduce them anyway.

[¶14.] After a hearing on the motions, the court denied Mary's motion for summary judgment. The court concluded that Doug's privacy was invaded and that Mary's "conduct was intentional; it did intrude upon conversations in which [Doug] had a reasonable expectation of privacy and it [was] a jury question whether under

these circumstances the intrusion was highly offensive." With reference to Strait's motion, the circuit court granted his motion for summary judgment on Count 1, holding that Strait's conduct was not intentional because he did not advise Mary "to secretly place the recording device," and "did not encourage her to continue recording the conversations." The court characterized Strait's acts as those of a passive observer who "merely preserved the recording."

[¶15.]    As for Count 2, aiding and abetting, the court granted summary judgment because Strait did not "substantially assist or encourage" Mary's wrongful conduct. The court also granted summary judgment for Strait on Count 3, which charged Strait with civil conspiracy.

[¶16.]    Subsequently, Doug reached a settlement agreement with Mary and the case against her was dismissed with prejudice. Doug appeals the circuit court's decision granting Strait's motions for summary judgment raising several issues which we restate as follows:

1.    Whether the circuit court erred in granting Strait summary judgment on Doug's claim for invasion of privacy.

2.    Whether the circuit court erred in granting Strait summary judgment on Doug's claim against Strait for aiding and abetting Mary in the invasion of Doug's privacy.

3.    Whether the circuit court erred in granting Strait summary judgment on Doug's claim that Strait conspired with Mary to invade Doug's privacy.

**Standard of Review**

[¶17.]    Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." SDCL 15-6-56(c). "A disputed fact is not material unless it would affect the outcome of the suit under the governing substantive law in that a reasonable jury could return a verdict for the nonmoving party." *Gul v. Ctr. for Fam. Med.*, 2009 S.D. 12, ¶ 8, 762 N.W.2d 629, 633 (cleaned up). The moving party carries "the burden of clearly demonstrating an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law." *Aqreva, LLC v. Eide Bailly, LLP*, 2020 S.D. 59, ¶ 15, 950 N.W.2d 774, 782 (citation omitted). All facts are viewed in the light "most favorabl[e] to the nonmoving party[.]" *North Star Mut. Ins. Co. v. Rasmussen*, 2007 S.D. 55, ¶ 14, 734 N.W.2d 352, 356.

## Analysis and Decision

### *Invasion of Privacy*

[¶18.]     Doug contends that the circuit court erred in granting summary judgment on his invasion of privacy claim because disputed issues of material fact exist regarding whether Strait's participation was minimal and designed to intentionally invade Doug's privacy. Doug points to several facts that he claims demonstrate that Strait was not merely a "passive observer[,]" including (1) Strait's failure to advise Mary that her conduct was criminal, (2) Strait's acts of keeping and reviewing the recordings, and (3) Strait's choice to offer the recordings into evidence at trial.

[¶19.]     To recover for invasion of the right to privacy, a party must prove an "unreasonable, unwarranted, serious and offensive intrusion upon the seclusion of

another." *Kjerstad v. Ravellette Publ'ns, Inc.*, 517 N.W.2d 419, 424 (S.D. 1994). "[T]he invasion must be one which would be offensive and objectionable to a reasonable man of ordinary sensibilities." *Roth v. Farner-Bocken Co.*, 2003 S.D. 80, ¶ 19, 667 N.W.2d 651, 660–61 (cleaned up). This invasion or intrusion must be the result of an intentional act, and it is the "*intrusion itself* [that] makes the defendant subject to liability" even if there is no publication or other use of what the defendant may have gleaned from the invasion. Restatement (Second) of Torts § 652B cmt. b (1977) (emphasis added); *see also Kjerstad*, 517 N.W.2d at 424; *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009) ("First, the defendant must intentionally intrude into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy. Second, the intrusion must occur in a manner highly offensive to a reasonable person.").

[¶20.]     In summary, the elements of the tort of invasion of privacy require an (1) intentional (2) invasion (3) that is unreasonable, unwarranted, serious, and offensive (4) of something to which the plaintiff has a reasonable expectation of privacy. A court's threshold determination of "whether there is an offensive invasion of privacy involves a question of law. If the court first decides there is substantial evidence tending to show a serious, unreasonable, unwarranted and offensive interference with another's private affairs, then the case is one to be submitted to the jury." *Montgomery Ward v. Shope*, 286 N.W.2d 806, 810 (S.D. 1979).

*a. Strait's alleged failure to immediately advise Mary to stop recording*

[¶21.]     Doug's first point of error concerns his claim that Strait's failure to give proper legal advice to Mary was an intentional oversight done for the purpose of interfering with Doug's private seclusion.  Because Strait's alleged omission springs from the attorney-client relationship and the duty to provide competent legal advice, we view Doug's argument as akin to an allegation of legal malpractice to determine the duties owed by Strait to Doug.

[¶22.]     When reviewing controversies involving duties owed by attorneys to third-parties, we have long-established our adherence to the strict privity rule. *Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 30, 652 N.W.2d 756, 769.  The privity rule limits third-party claims such that, "to recover for a lawyer's negligence, a plaintiff must first show that an attorney-client relationship existed between the lawyer and the plaintiff."[9]  *Id.*  Here, Strait and Doug had no such relationship.  "A duty to a third person hence exists only when the client intends to benefit the third person as one of the primary objectives of the representation."  *Id.* ¶ 34, 652 N.W.2d at 771 (quoting Restatement (Third) of the Law Governing Lawyers § 51 cmt. f (1998)).  Doug, as the defendant in Mary's divorce action, was not the intended beneficiary of Strait's representation.  In light of the confidentiality and trust integral to legal representation, Strait's and Mary's attorney-client "relationship

---

9.     Several important reasons support the strict rule of privity in attorney malpractice cases including: (1) preserving the attorney's duty of loyalty to the client as the client's advocate, (2) avoiding conflicts of interest, (3) limiting the number of persons a lawyer may be accountable to, and (4) maintaining attorney-client confidentiality.  *Chem-Age Indus.*, 2002 S.D. 122, ¶ 31, 652 N.W.2d at 769 (citations omitted).

requires greater protection from [Doug's] third-party claims than do nonconfidential relationships." *Id.* ¶ 32, 652 N.W.2d at 770.

[¶23.] Further, Doug's allegations surrounding Strait's failure to properly advise Mary cannot be characterized as an intentional act to invade Doug's privacy. It is uncontested that recording Doug was neither Strait's idea nor his advice to Mary. And Doug does not claim that Strait advised Mary to keep recording, but rather, that Strait should have advised Mary at the outset to stop recording. Doug's argument can therefore only be countenanced in terms of negligence.

[¶24.] Although there is a disputed question of fact regarding when Strait advised Mary that she should stop recording Doug, either on December 3 as he contends or in January according to Mary, Strait's legal advice to Mary did not breach a legal duty that Strait owed to Doug, and does not provide a legal basis for Doug to sue Strait. *See Chem-Age Indus.*, 2002 S.D. 122, ¶ 43, 652 N.W.2d at 774 ("Attorneys acting in a professional capacity should be free to render advice without fear of personal liability to third persons if the advice later goes awry[, but] . . . lawyers should not be free to substantially assist their clients in committing tortious acts."). However, the timing of Strait's advice to Mary may be relevant to Strait's intent to aid and abet Mary in committing an invasion of privacy.

*b. Strait's involvement with Mary's recordings*

[¶25.] Doug's second claim of error focuses on Strait's handling of Mary's recordings, which, in his view, presented sufficient factual basis for an intentional invasion of privacy claim. Strait readily acknowledges that his staff saved and copied the recordings onto compact discs for Mary. Further, Strait and his

paralegal listened to snippets of the recordings at various times, billing Mary for these services. However, Doug does not assert that Strait personally intruded into his privacy.

[¶26.] Despite these undisputed facts and the apparent illegality of the recordings, these actions do not constitute an actual invasion of Doug's privacy by Strait. Strait argues on several grounds that he did not invade Doug's privacy, specifically, that offering the evidence at trial months after the recordings had stopped had no bearing on the intrusion into Doug's privacy, that an attorney cannot be held liable for an invasion of privacy by "merely" providing legal services, and that the litigation privilege applies and immunizes Strait's conduct.

[¶27.] Here, however, we conclude that Doug failed to present material evidence showing that Strait's conduct involved an actual *invasion* of Doug's privacy, which is a basic element of the tortious invasion of privacy claim. *See* Restatement (Second) of Torts § 652B. Strait's handling of Mary's recordings does not constitute an invasion in and of itself. Mary's action of placing the recording device in Doug's office is the only invasion of Doug's privacy that occurred in this case. While Strait may have substantially assisted in Mary's conduct by accepting the recordings (an argument that relates to Doug's aiding and abetting claim against Strait), there is no evidence that any of Strait's actions invaded Doug's privacy. Mary initiated the clandestine recordings of Doug before she retained Strait, although the recordings continued with Strait's assistance downloading and storing the recordings after Mary engaged him. Doug has failed to present any argument or authority that Strait's acceptance of Mary's recordings on their own

were invasions by Strait into Doug's privacy. Without more, there is no question of fact for the jury regarding whether Strait's conduct constituted an invasion.

[¶28.] As support for his contrary view, Doug points to the California Supreme Court's decision in *Kimmel v. Goland,* 793 P.2d 524 (Cal. 1990). In *Kimmel,* the plaintiffs began secretly recording the telephone conversations of a mobile home park manager in anticipation of litigation against the park. *Id.* at 526. The plaintiffs' attorney then used information gleaned from the recordings to file the lawsuit. *Id.* When management eventually discovered the recordings, they filed a cross-complaint for violation of California's Invasion of Privacy Act seeking damages against the plaintiffs and their attorney. *Id.* at 526–27. Importantly, the only claim against the attorney in *Kimmel* arose from "his alleged conduct in *aiding and abetting* a violation of the privacy act." *Id.* at 531 (emphasis added). Therefore, *Kimmel* does not support Doug's claim that Strait's actions constituted an invasion of privacy, but it *does* support Doug's ability to bring an aiding and abetting claim against Strait for *Mary's* invasion of his privacy. *Id.*

[¶29.] *Kimmel* is, however, also applicable to Strait's ability to claim protection under the litigation privilege for the claims that do arise against him. The attorney in *Kimmel* claimed he was shielded by the litigation privilege in section 47(2) of the California Civil Code precluding liability for publication or broadcasts made by an attorney in a judicial proceeding. *Id.* at 528. The California Supreme Court ultimately determined that the attorney, while immune from suit for broadcasting or publishing the information within a judicial proceeding, was not immune from an invasion of privacy suit for "noncommunicative acts—the illegal

recording of confidential telephone conversations—*for the purpose of gathering evidence to be used in future litigation.*" *Id.* at 525 (emphasis added).

[¶30.] Thus, the circuit court did not err in holding that Strait did not personally invade Doug's privacy by his actions in assisting Mary to download and retain the recordings, but Strait is not immune for any substantial assistance by way of aiding and abetting Mary to invade Doug's privacy.

    *c. Strait's attempt to introduce the recordings as exhibits*

[¶31.] Doug also maintains that Strait's attempt to introduce the recordings into evidence constitutes an intentional invasion of his privacy. Strait submits that he is shielded from liability by the litigation privilege. We agree.

[¶32.] "Defamation, including libel or slander, is statutorily defined as an unprivileged publication." *Harris v. Riggenbach*, 2001 S.D. 110, ¶ 7, 633 N.W.2d 193, 194; *see also* SDCL 20-11-3; SDCL 20-11-4. However, when such publications or communications are made under an existing privilege they are not actionable. *Petersen v. Dacy*, 1996 S.D. 72, ¶ 6, 550 N.W.2d 91, 92; *Harris*, 2001 S.D. 110, ¶ 7, 633 N.W.2d at 194. Privileged communications are defined in SDCL 20-11-5, which includes a provision for communications made in "any legislative or judicial proceeding, or in any other official proceeding authorized by law[.]" SDCL 20-11-5(2). A communication made under SDCL 20-11-5(2) has an absolute privilege "and remain[s] privileged whether made with or without malice." *Peterson v. City of Mitchell*, 499 N.W.2d 911, 915 (S.D. 1993).

[¶33.] We have not previously considered the application of the litigation privilege in a case where an attorney's communication results in an alleged invasion

of privacy. However, it is well established that the circumstances under which there is an absolute privilege to publish defamatory matter and to publish any matter that is an invasion of privacy are the same in all respects. Restatement (Second) of Torts § 652F, cmt. a (1977). This is because "[t]he defense of absolute privilege or immunity under the law of defamation avoids all liability. The salutary purpose of the privilege should not be frustrated by putting a new label on the complaint." *Harris*, 2001 S.D. 110, ¶ 14, 633 N.W.2d at 196 (cleaned up). Adopting this rationale, we hold that the litigation privilege (an absolute privilege for publication of defamatory matter) applies in appropriate cases to an invasion of privacy claim as well.

[¶34.] Four conditions must be met before an attorney is afforded the absolute litigation privilege: "the publication (1) was made in a judicial proceeding; (2) had some connection or logical relation to the action; (3) was made to achieve the objects of the litigation; and (4) involved litigants or other participants authorized by law." *Janklow v. Keller*, 90 S.D. 322, 331, 241 N.W.2d 364, 368 (1976) (citation omitted). When we applied the litigation privilege in *Janklow*, we placed special emphasis "on the requirement that [statements by an attorney] be made in furtherance of the litigation and to promote the interests of justice." *Id.* (citation omitted).

[¶35.] It is undisputed that Strait offered the recordings during a judicial proceeding as part of Mary's divorce. Although Strait admitted in his deposition that the recordings would not affect the outcome of the divorce, they contained information minimally relevant to the contested issues. Mary requested a divorce

on the grounds of adultery and extreme cruelty, an award of alimony, and an equitable division of the parties' multi-million-dollar marital estate. The recordings contained evidence of Doug's affair and his net worth.[10] And Doug does not dispute that he was the individual on the recordings that Strait attempted to introduce into evidence. Accordingly, Strait's attempt to introduce the recordings into evidence during a judicial proceeding, while misguided, are within the absolute privilege under SDCL 20-11-5(2). The circuit court did not err in granting summary judgment to Strait on the invasion of privacy claim.[11]

**Aiding and Abetting**

[¶36.]    Doug next asserts that Strait aided and abetted Mary's invasion of his privacy for the same reasons already discussed. In response, Strait maintains that his actions in preserving Mary's evidence and attempting to introduce it are acts typical for an attorney engaged in litigation and therefore cannot be considered as substantially assisting Mary in her allegedly tortious conduct.

[¶37.]    Whether an attorney may aid and abet his client's invasion of another's privacy is a question of first impression. However, in *Chem-Age Industries, Inc. v. Glover*, we considered whether an attorney may aid and abet his client in breaching fiduciary duties owed to investors. 2002 S.D. 122, ¶ 41, 652 N.W.2d at 773. In *Chem-Age Industries*, we applied the test from the Restatement

---

10.    This case was acrimonious in several respects. Doug was held in contempt of court during the proceedings for refusing to turn over assets that Mary was awarded pursuant to the decree of divorce.

11.    Our determination that Strait is shielded from liability for offering the recordings does not necessarily resolve the question whether this evidence may be relevant to the claims of aiding and abetting invasion of privacy.

(Second) of Torts § 876(b) and concluded that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." 2002 S.D. 122, ¶ 41, 652 N.W.2d at 773 (quoting Restatement (Second) of Torts § 876(b) (1977)). This "substantial assistance requirement carries with it a condition that the lawyer must actively participate in the breach[.]" *Id.* ¶ 44, 652 N.W.2d at 774. Further, the attorney's assistance must be "knowing." *Id.* ¶ 45, 652 N.W.2d at 775.

[¶38.] We find this framework helpful in analyzing the issue here as to whether an attorney can aid and abet his client's invasion of another's privacy. In *Chem-Age Industries*, when recognizing the tort of aiding and abetting a client's breach of a fiduciary duty, we observed:

> On the one hand, overbroad liability might diminish the quality of legal services, since it would impose self-protective reservations in the attorney-client relationship. Attorneys acting in a professional capacity should be free to render advice without fear of personal liability to third persons if the advice later goes awry. On the other hand, the privilege of rendering professional services not being absolute, lawyers should not be free to substantially assist their clients in committing tortious acts. To protect lawyers from meritless claims, many courts strictly interpret the common law elements of aiding and abetting the breach of a fiduciary duty.

2002 S.D. 122, ¶ 43, 652 N.W.2d at 774 (cleaned up).

[¶39.] We conclude for the same reasons we discussed in *Chem-Age Industries* that in representing a client, an attorney "should not be free to substantially assist their clients in committing [the] tortious act[ ]" of invasion of privacy. *Id.* In fact, in recognizing a claim against an attorney for aiding and abetting an invasion of

privacy, the California Supreme Court rejected the claim that the threat of civil liability for such actions based on a violation of the privacy act may chill investigation and advocacy by attorneys, stating, "such forbearance is, in fact, healthy to the extent it inhibits an attorney from assisting clients in the commission of crimes." *Kimmel*, 793 P.2d at 531.

[¶40.] Additionally, a fundamental requirement of establishing a claim for aiding and abetting is the existence of an underlying tort. *See Chem-Age Indus.*, 2002 S.D. 122, ¶ 46, 652 N.W.2d at 775. Here, the circuit court denied Mary's motion for summary judgment regarding the existence of an invasion of privacy, permitting the questions whether Mary "intrude[d] upon conversations in which [Doug] had a reasonable expectation of privacy" and "whether under the circumstances the intrusion was highly offensive" to be submitted to a jury. Prior to trial, however, Mary settled with Doug, thus avoiding a jury determination of liability. Notwithstanding Mary's settlement with Doug, this record presents genuine issues of material fact as to whether Mary invaded Doug's privacy and whether Strait substantially assisted Mary in doing so.

[¶41.] Strait argues that no claim for invasion of privacy can be asserted by Doug because he did not have a reasonable expectation of privacy in his office. A reasonable expectation is an essential element not just for the invasion of privacy claim, but also for the claims of aiding and abetting invasion of privacy. Strait cites Fourth Amendment cases providing that an individual has a lesser privacy interest in commercial premises than in one's home. *See New York v. Burger*, 482 U.S. 691, 700, 107 S. Ct. 2636, 2642, 96 L. Ed. 2d 601 (1987) ("An expectation of privacy in

commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home."). However, none of the cases cited by Strait are factually analogous to the circumstances involving Doug's office.

[¶42.]    Doug's office had a door that closed between his office and the shop, and the door from his office to outside the building had a lock to which both Doug and Mary had a key. Further, Doug would at times sleep overnight in the office as it had kitchen appliances, a restroom, and shower facilities. Most of the recordings were made late at night after the business was closed. Doug's office door was closed during these times and there is no evidence that anyone would have been able to observe or overhear Doug's conversations or actions. Although Mary had access to the office, there is no evidence she or anyone else ever entered his office after business hours. In fact, Mary testified that she placed the recording device in Doug's office late in the day because she knew he would spend his free time alone in the office at night after the business was closed. These facts present substantial evidence tending to show that Doug had a reasonable expectation of privacy in his office, and the circuit court correctly determined that the case could proceed past summary judgment on the issue of whether Doug had a reasonable expectation of privacy during the time Mary was recording his conversations.

[¶43.]    Additionally, to establish a claim for aiding and abetting invasion of privacy, Doug must not only show that Strait provided substantial assistance to Mary in committing the tort of invasion of privacy, but also that Strait had the intent to commit the intentional tort of invasion of privacy. In other words, the aider and abettor must have the same intent as the principal to be held liable for

the intentional tort of invasion of privacy as the aider and abettor. "Intentional tortious conduct occurs when a person acts either for the purpose of causing or with knowledge to a substantial certainty that their act will cause an invasion of the interest of another in a way that the law forbids." *Kjerstad*, 517 N.W.2d at 429.

[¶44.] In *Chem-Age Industries*, we recognized that to aid and abet an intentional tort, an attorney must render substantial assistance by actively participating in a client's wrongful conduct and that the attorney must have acted knowing that the actions would allow the client to accomplish the wrong. 2002 S.D. 122, ¶ 44, 652 N.W.2d at 774–75.

[¶45.] On the question whether Strait provided substantial assistance to Mary to accomplish the act of invasion of privacy, the Restatement (Second) of Torts § 876 cmt. d sets forth several relevant factors, including "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind[.]" Further, the defendant is not ordinarily liable for other's acts that were not foreseeable by him. *Id.*

[¶46.] On this record, genuine issues of material fact exist concerning whether Mary committed an invasion of privacy, whether Strait provided substantial assistance to invade Doug's privacy, and whether Strait acted with knowledge to a substantial certainty that an invasion of Doug's privacy would occur. Viewing the evidence in the light most favorable to Doug establishes that Strait knew for approximately a month that Mary was secretly placing the recording device in Doug's office, and that Strait assisted her in downloading and storing the

recordings. Strait's staff, at his direction and with his knowledge, regularly received the recording device from Mary, downloaded the recordings on the law office's server, burned the recordings onto a CD that would be given to Mary, deleted the recordings from the recording device, and then would return the device to Mary so she could obtain more recordings. Mary testified that she was unable to download the recordings from the device on her own and relied on Strait's staff to assist her. Mary also testified that she continued to make these recordings until sometime in January when Strait advised her to stop because the activity could be illegal. Significantly, there is also evidence suggesting that the reason Mary frequently brought the recording device to Strait's office was so that the recordings could be preserved and then erased from the device to allow Mary to make more recordings.

[¶47.] Consideration of these facts in the light most favorable to Doug supports a reasonable inference that Mary could not have continued the secret recordings had it not been for Strait's paralegal's actions in downloading and freeing up space on her recording device, and that Strait knew that he was facilitating her conduct. Therefore, summary judgment is inappropriate on this claim because there are genuine questions of material fact regarding whether Strait knowingly provided substantial assistance to Mary in her invasion of Doug's privacy. For this reason, the circuit court erred in granting Strait summary judgment on Doug's claim against Strait for aiding and abetting Mary's invasion of privacy.

**Civil Conspiracy**

[¶48.] Finally, Doug contends that because Strait's actions "mirror[ed] the elements of civil conspiracy," the circuit court erred by dismissing Doug's claim. Specifically, Doug claims that Strait and Mary had a "meeting of the minds" to commit tortious conduct because Strait (1) knew that Mary's recordings were unlawful, (2) knew that Mary wanted to introduce the embarrassing recordings as evidence, and (3) attempted to introduce those recordings into evidence.

[¶49.] In response, Strait first argues that an attorney cannot conspire with his client as a matter of law. Alternatively, Strait argues that the undisputed facts do not establish an agreement between Mary and Strait to commit a tortious act because Mary recorded Doug of her own volition. In furtherance of his claim that he did not agree to record Doug, Strait submits that Mary wanted to determine if Doug was having an affair, but that he had no intention of using the evidence at trial because resolution of the case dealt primarily with division of the marital estate.

[¶50.] We have long recognized a cause of action for civil conspiracy despite not having applied this cause of action in the specific context of attorneys conspiring with their clients. *Reuben C. Setliff, III, M.D., P.C. v. Stewart*, 2005 S.D. 40, ¶¶ 26–27, 694 N.W.2d 859, 866–67. To establish a prima facie case of civil conspiracy, a plaintiff must prove the following:

> (1) two or more persons;
> (2) an object to be accomplished;
> (3) a meeting of the minds on the object or course of action to be taken;
> (4) the commission of one or more unlawful overt acts; and
> (5) damages as the proximate result of the conspiracy.

*Id.* ¶ 27, 694 N.W.2d at 866–67. "This is not an independent cause of action, but is sustainable only after an underlying tort claim has been established. A civil conspiracy is, fundamentally, an agreement to commit a tort." *Id.* ¶ 27, 694 N.W.2d at 867 (cleaned up). Before Doug could prevail on his conspiracy claim, he would be required to prove at trial that Mary committed the underlying tort of invasion of privacy.

[¶51.]    In granting summary judgment for Strait, the circuit court held:

> With the first two cause[s] of action dismissed[,] there is now no underlying tort claim.[ ] Additionally, the first element of civil conspiracy is the requirement that there be "two or more persons" involved. That was not the case. There was no meeting of the min[d]s.

The exact basis for the circuit court's holding is somewhat unclear. The court may have granted summary judgment because it concluded that an attorney cannot conspire with his or her client as a matter of law, or the court may have determined that there was no agreement between Mary and Strait to commit a tort. Additionally, the court may have held that the evidence showed that both elements of conspiracy were missing.

[¶52.]    While there may be questions of fact concerning the other elements of conspiracy, the circuit court's holding that Mary and Strait cannot be considered as two separate individuals is a question of law suitable for review. To make a prima facia case of civil conspiracy, the first element, that there are "two or more persons" involved, must be met. *Setliff*, 2005 S.D. 40, ¶¶ 26–27, 694 N.W.2d at 866–67. Strait argues that a client and his or her attorney as principal and agent cannot be

classified as separate individuals for the purpose of meeting the first element of a conspiracy claim when the attorney is acting as a representative of the client.

[¶53.] In support of this argument, Strait likens the existence of a conspiracy claim in attorney-client relationships to the intra-corporate conspiracy doctrine. In *Sisney v. Best Inc.*, we held that a corporate employer and employee cannot conspire with each other because a corporation cannot conspire through its agents when the agent is acting within the scope of employment. *See* 2008 S.D. 70, ¶ 10 n.3, 754 N.W.2d 804, 809 n.3. The doctrine is helpful in framing the issue here. Just as a corporation and its agent cannot conspire with each other when the agent is acting within the scope of employment, so too a client and an attorney cannot conspire with each other when the attorney is within the scope of his or her representation.[12] In both situations, the principal and agent are not separate individuals. For this reason, civil conspiracy under these facts between Strait and Mary is a legal impossibility and Doug's claim of civil conspiracy fails on this ground.

[¶54.] We reverse the entry of summary judgment as to Doug's claim in Count 2 (aiding and abetting), but we affirm the entry of summary judgment as to Counts 1 and 3.

[¶55.] JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, and GILBERTSON, Retired Chief Justice, concur.

---

12. However, even when an attorney is acting within the scope of the representation, some states have adopted the "exceptional circumstances" rule, which allows an attorney to still be held liable for civil conspiracy for fraudulent, malicious or intentionally tortious conduct. *See Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co.*, 931 S.W.2d 166, 176 (Mo. Ct. App. 1996). We decline to address whether to adopt the exceptional circumstances rule in this case.

[¶56.]    MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.